**SWAN CREEK TOWNSHIP, Appellant,**

v.

**WYLIE & SONS LANDSCAPING et al., Appellees.**

[Cite as *Swan Creek Twp. v. Wylie & Sons Landscaping,*
168 Ohio App.3d 206, 2006-Ohio-584.]

Court of Appeals of Ohio,
Sixth District, Fulton County.

No. F–05–005.

Decided Feb. 10, 2006.

Kevin A. Heban and Gerald E. Galernik, for appellant.

Clayton M. Gerbitz, for appellee.

SINGER, Presiding Judge.

{¶ 1} This is an appeal from a judgment of the Fulton County Court of Common Pleas, denying injunctive relief sought by a township in a zoning dispute. For the reasons that follow, we affirm.

{¶ 2} In September 2002, appellees, Thomas J. and Lisa Wylie and Wylie & Sons Landscaping, purchased a 79–acre parcel of land on Fulton County Road 5 in Swan Creek Township. Appellees are in the business of mining, excavating, and selling topsoil and sand.

{¶ 3} On September 16, 2002, appellees applied to the Ohio Department of Natural Resources ("ODNR") for a surface-mining permit for the County Road 5 location. As part of the permit process, appellees were required to publish notice of their application.

{¶ 4} Advised of appellees' intention by the published notice, neighbors to the property became concerned that the proposed operation would negatively affect their property enjoyment through increased noise and dust near their homes and through additional traffic on the rural county road. A group of 30 to 40 of these residents formed an organization called Concerned Residents of Swan Creek Township to oppose excavation and mining on appellees' land.

{¶ 5} The group formally notified ODNR of its opposition to appellees' permit application, and many appeared in opposition at an ODNR public hearing. Advised by the township trustees that since Swan Creek Township was unzoned, appellees' proposed use was permitted, the group initiated a petition drive to place enactment of township zoning on the May 6, 2003 ballot.

{¶ 6} The neighbors' entreaties to ODNR were unsuccessful. On April 21, 2003, ODNR issued the permit appellees sought. Efforts to bring zoning to the township fared differently. On May 17, 2003, the Fulton County Board of Elections certified passage of the zoning initiative. Pursuant to R.C. 519.11, when the election board certified enactment of the zoning plan, the property at

issue became zoned "agricultural-real estate," a classification that would preclude mining or excavating.

{¶ 7} On Saturday June 7, 2003, neighbors to appellees' site awoke to the sound of dump trucks and heavy equipment extracting and hauling away soil. Several neighbors complained to township officials, who dispatched the township zoning inspector to the site. The inspector ordered operations to stop because mining violated the township's newly enacted zoning code.

{¶ 8} When appellees refused to comply with the zoning inspector's order, appellant, Swan Creek Township, instituted the action that underlies this appeal. Appellant sought preliminary and permanent injunctions barring appellees' mining activities. Appellees responded to appellant's verified complaint, admitting that it was engaged in mining, but pointing out that R.C. 519.19 expressly permits the continuance of the nonconforming use of land that was established before the enactment of zoning. Appellees insisted that they began to excavate and mine the land prior to the institution of the township zoning code.

{¶ 9} At the hearing on the preliminary injunction, three neighbors to the property testified that they had first observed activity on the land on June 7, 2003. Appellee Thomas Wylie, however, testified that he had obtained his mining permit from ODNR effective April 21, 2003. On that very day, Wylie testified, he took an excavator to the site and began stripping topsoil for later removal. According to Wylie, his employees returned to the site the following Saturday, April 26, 2003, and removed between 4,000 and 6,000 cubic yards of topsoil, some of which they sold and some of which was stored for sale elsewhere. Wylie's testimony was corroborated by his operations manager, who testified that on April 26 he had dispatched "a half dozen" trucks to the County Road 5 project. A farmer, who had contracted with appellees to grow crops on the part of the Road 5 project not being mined, testified that he was on the property in early May 2003 and observed a hole and "some piles of dirt." Appellees also introduced invoices and corresponding payment checks for topsoil delivered on April 26, 2003.

{¶ 10} Following the hearing, the trial court denied the preliminary injunction, finding that appellees had "commenced mining operations on April 21, 2003, and clearly engaged in 'substantial mining operations' on April 26, 2003."

{¶ 11} On September 28, 2004, the court held a hearing on appellant's petition for a permanent injunction. At the hearing, James and Karen Irwin, whose home is directly across the road from the site, testified that they were both home on April 26 and failed to see any activity on the property on that date or any date prior. By contrast, the Irwins reported, they knew immediately from the noise and dust produced that the operation had begun on June 7.

{¶ 12} William and Douglas Bauman, father-and-son farmers of the property immediately adjacent to appellees' land, testified that as of May 30, 2003, they had seen no excavation at the project. Douglas Bauman testified that, indeed, they had been watching the property to see when work activity would begin, yet saw nothing before June 7.

{¶ 13} Edwina Mattimore testified that although she did not live near the site, on April 26, she was at the County Road 5 home of her grandson, Matthew, and his wife, Carla, preparing for a birthday party for her great-granddaughter. All three testified that they were outside for a substantial part of that day, but saw no activity at the site across the road.

{¶ 14} Ron and Amy Jo Rouleau live on the same side of Road 5 in front of appellees' property. The route appellees' dump trucks take out of the excavation site is directly south of the Rouleaus' barn. Both testified that they believed they were home on April 26 and failed to observe any activity on the site. Both reported seeing no site work until June 7.

{¶ 15} The entrance to the site is immediately north of Robert Markey's home. He was awakened by the sound of trucks on the morning of June 7, "about fifty feet from my back room." According to Markey, this was the first time he had noticed work on the site.

{¶ 16} On cross-examination, appellees tried to shake the certainty of these witnesses. Some wavered, but most remained adamant that if there was excavating occurring on April 26, they would have seen it, and they did not.

{¶ 17} The matter was submitted to the court on written final arguments by the parties. Appellant, relying on the testimony of some 13 witnesses, argued that the vast weight of the evidence revealed that appellees' assertion that work on the site predated the zoning code was pure fabrication. Additionally, appellant argued, if work on the site did precede zoning, it was not "mining" within the legal definition and/or that the extraction of some 6,000 cubic feet of soil out of some 1.1 million tons of soil did not meet the common-law standard of a substantial nonconforming use necessary to establish preexisting use.

{¶ 18} Appellees, pointing to the testimony that they received their ODNR surface-mining permit on April 21, 2003, commenced work on the site the same day, and used the profit from the excavation in commerce on April 26, 2003, argued that they had established a substantial use of the land antecedent to the May 17, 2003 zoning code.

{¶ 19} The trial court found that appellees had established a prior nonconforming use and denied the injunctive relief appellant sought. From this judgment, appellant now brings this appeal. Appellant sets forth the following two assignments of error:

{¶ 20} "I. The trial court abused its discretion when it denied appellant's request for a permanent injunction.

{¶ 21} "II. The trial court's decision is against the manifest weight of the evidence."

{¶ 22} We shall discuss appellant's assignments of error together.

{¶ 23} R.C. 519.24 provides that a township may seek injunctive relief in the enforcement of zoning. To prevail, the township must show, by clear and convincing evidence, that the defendant is using his or her property in violation of a zoning ordinance. *Baker v. Blevins*, 162 Ohio App.3d 258, 262, 2005-Ohio-3664, 833 N.E.2d 327, at ¶ 12; *Union Twp. Bd. of Trustees v. Old 74 Corp.* (2000), 137 Ohio App.3d 289, 294, 738 N.E.2d 477. Once a violation is established, the decision of whether to grant or deny injunctive relief rests in the sound discretion of the court. *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496.

{¶ 24} There is no dispute that mining and excavation are impermissible present uses for the property at issue in this matter. Nevertheless, both R.C. 519.19 and Section 100–6.3 of the Swan Creek Township Zoning Code provide that a lawful use of land that existed at the time zoning was enacted may be continued as a nonconforming use. The party seeking to take advantage of a nonconforming use must demonstrate, by a preponderance of the evidence, that the use was lawful and that it antedated the institution of zoning. *Eckart v. Coonce*, 11th Dist. No. 2003–T–0102, 2004-Ohio-5327, 2004 WL 2801696, at ¶ 7–8. "[W]here no substantial nonconforming use has been made of property * * * a property owner has acquired no vested right to such use." *Smith v. Juillerat* (1954), 161 Ohio St. 424, 431, 53 O.O. 340, 119 N.E.2d 611, approved and followed in *Torok v. Jones* (1983), 5 Ohio St.3d 31, 5 OBR 90, 448 N.E.2d 819, at paragraph two of the syllabus.

{¶ 25} Appellant argues that even accepting the trial court's finding that appellees broke ground on April 21 and trucked away 4,000 to 6,000 cubic feet of soil on April 26, this does not constitute the "substantial use" of the property necessary to vest a right in a nonconforming use. Even 6,000 cubic feet of soil is only a minuscule portion of the total expected yield of the site. Additionally, appellant maintains that the legal definition of "mining" requires excavation deeper than the hole appellees dug.

{¶ 26} Appellees respond to appellant's argument concerning the definition of mining by pointing out that if what appellees did on the property was not legally mining or excavating, it did not violate the zoning code. If it did not violate the zoning code, appellees ask rhetorically, then how could the same activity now be a violation of the code?

{¶ 27} In our view, both of these arguments are subsumed in the "substantial use" issue. The problem with "substantial use" is that neither *Juillerat, Torok,* the cases that follow, nor the statutes define what constitutes a substantial use. *Juillerat* comes the closest by suggesting that the contemplation of use or money spent on preliminary work is not enough, *Juillerat,* 161 Ohio St. at 431, 53 O.O. 340, 119 N.E.2d 611, but offers no opinion as to what is enough.

{¶ 28} In common usage, the word "substantial" possesses several meanings. Most applicable in this context would be "[1]b: not imaginary or illusory [2]b: considerable in quantity [or] 5: being largely but not wholly that which is specified." Merriam Webster's Collegiate Dictionary (10th Ed.1996) 1174. Using this benchmark, we must conclude that the work described by appellees' witnesses as having been performed on April 21 could likely be classified as not illusory, considerable, and largely, but perhaps not wholly, constituting mining and excavation. The activity described as having occurred on April 26 constituted complete or nearly complete mining or excavation. In either event, if appellees' witnesses are to be believed, there was substantial use of the property as a mining and excavation site prior to the institution of zoning.

{¶ 29} Remaining is the question of whether the trial court properly found that appellees had engaged in mining and excavating on April 21 and 26, 2003. Appellant vociferously argues that the evidence presented by it—some 13 witnesses who testified that they had seen no work on the site until June 7—far outweighs the testimony of Tom Wylie, his employee, and his contract farmer. In its final decision, the trial court was exceptionally candid about its consideration of the credibility of the witnesses:

{¶ 30} "Were the court to accept [appellant's] position, the court would have to conclude that [appellee Wylie] had willfully lied in his testimony, his witnesses had perjured themselves, and that he had 'doctored up' or 'forged' the independently maintained business records and supporting documentation.

{¶ 31} "Were the court to accept [appellees'] position, the court would have to conclude that [appellant's] witnesses had been either extremely lax in their vigilance, or they had suffered a series of faulty recollections, even though some of those recollections were supported by calendars and diaries.

{¶ 32} "With regard to [appellant's] witnesses, the court can find that mistakes were made, and it need not go the extra step of making a further finding that [appellant's] witnesses intentionally lied or perjured themselves. Not so with [appellees'] witnesses. With regard to them, they either lied, or they told the truth. This is a crucial difference between the testimony of the two sets of witnesses, and the Court is constrained to recognize this difference in determining the ultimate issues of credibility in this case."

{¶ 33} The latitude afforded an appeals court when reviewing a trial court's findings of fact is exceptionally circumscribed. The trial court's findings are presumed correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. This deference "rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. Indeed, the appellate court may not reverse a judgment as against the manifest weight of the evidence if for each of the elements of the case there is presented "some competent, credible evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. "Competency" in this circumstance means testimony from one who has personal knowledge of the matter for which testimony is elicited. Evid.R. 601, 602; see, also, Black's Law Dictionary (6th Ed.1990) 284. "Credible" means worthy of belief. Id. at 366. "Some," in this context, means "any." *New Phila, Inc. v. Sagrilla,* 5th Dist. No. 2001AP040033, 2002-Ohio-3485, 2002 WL 1467771, at ¶ 39.

{¶ 34} Clearly in this matter, there was testimony from persons in a position to know that appellees began work on the site at issue on two occasions prior to the enactment of township zoning. There is nothing in this testimony, in and of itself, that would make it not credible. The testimony is neither self-contradictory nor illogical. Standing alone, the testimony is both a possible and a reasonable explanation of the circumstances. If we were to hear all of the testimony as the trier of fact, we may very well have come to a different conclusion. However, this is not the standard. An appellate court should not substitute its judgment for that of the trial court. Consequently, given the constraints within which we must view this case, we must conclude that there was some competent, credible evidence presented by which the trial court could have found that appellees made substantial mining and excavating use of their property before May 17, 2003. The court's finding of a preexisting nonconforming use is affirmed. Consequently, the trial court did not abuse its discretion in denying injunctive relief. Accordingly, both of appellant's assignments of error are not well taken.

{¶ 35} On consideration whereof, the judgment of the Fulton County Court of Common Pleas is affirmed.

Judgment affirmed.

PIETRYKOWSKI and SKOK, JJ., concur.