[Cite as *State v. Mallory*, 2022-Ohio-3667.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                    :

                                                          No. 111115

    v.                                               :

DEVON L. MALLORY,                         :

    Defendant-Appellant.                :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
                     AND REMANDED
**RELEASED AND JOURNALIZED:** October 13, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652296-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Anna Faraglia, Assistant Prosecuting
Attorney, *for appellee.*

Buckeye Law Office and P. Andrew Baker, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Devon L. Mallory ("Mallory"), appeals from his convictions and sentence following a bifurcated trial. He raises the following assignments of error for review:

1. The trial court erred when it convicted defendant-appellant for felony domestic violence when the conviction was not supported by sufficient evidence and must be modified to a misdemeanor domestic violence conviction.

2. The trial court erred when it convicted defendant-appellant of child endangering under R.C. 2929.22(A) as the conviction was not supported by sufficient evidence.

3. The trial court erred when it improperly convicted defendant-appellant of involuntary manslaughter when a conviction was not supported by sufficient evidence.

4. The trial court erred when it convicted defendant-appellant under R.C. 2929.22(A), domestic violence as a felony, and involuntary manslaughter, when the facts were against the manifest weight of the evidence.

5. The trial court erred when it improperly convicted defendant-appellant on Counts 5, 6, and 7 as he did not receive effective assistance of counsel.

6. The trial court erred when it improperly imposed postrelease control and this term must be modified.

7. The trial court erred when it imposed a sentence pursuant to the Reagan Tokes Law.

{¶ 2} After careful review of the record and relevant case law, we affirm in part, reverse in part, and remand for further proceedings before the trial court.

## I. Procedural and Factual History

{¶ 3} In September 2020, Mallory was named in a seven-count indictment, charging him with aggravated murder in violation of R.C. 2903.01(C) (Count 1); murder in violation of R.C. 2903.02(B) (Count 2); felonious assault in violation of R.C. 2903.11(A)(1), with a specification pursuant to R.C. 2941.1426(A) alleging that the victim suffered permanent disabling harm as a result of the offense and the

victim was under ten years of age at the time of the offense (Count 3); endangering children in violation of R.C. 2919.22(B)(1), with a furthermore specification that the violation resulted in serious physical harm to the victim (Count 4); involuntary manslaughter in violation of R.C. 2903.04(A) (Count 5); endangering children in violation of R.C. 2929.22(A), with a furthermore specification that the violation resulted in serious physical harm to the victim (Count 6); and domestic violence in violation of R.C. 2919.25(A), with a furthermore specification that the offender previously pleaded guilty to or has been convicted of assault against a family or household member (Count 7). The indictment stemmed from allegations that Mallory caused the death of the minor victim, S.E. (d.o.b. 01/08/2019), on July 25, 2020.

{¶ 4} Mallory pleaded not guilty to the indictment, and the matter proceeded to a jury trial on Counts 1-6. Mallory voluntarily waived his right to a jury trial on Count 7 and elected to have the domestic violence charge tried before the bench. As pertinent to this appeal, the following facts were adduced at trial.

{¶ 5} On July 19, 2020, Christina Rosa ("Mother") moved into the home of her then boyfriend, Mallory, with her two minor daughters, S.E. and Su.E. Mother and her daughters lived in the home with Mallory, Mallory's three-year old son, J.M., and Mallory's teenaged brother, T.W. Mother testified that S.E. slept on a toddler bed that was located in the master bedroom where Mother and Mallory also slept. Su.E. slept in a nearby bedroom that also served as the children's toy room.

{¶ 6} On the morning of July 25, 2020, Mother woke up early to get ready for work. As part of her morning routine, Mother changed S.E.'s diaper, gave her a kiss, and tucked her back into bed. Mother then left for work at approximately 7:00 a.m. Throughout that day, Mother called Mallory on several occasions to see how Mallory and the children were doing. Mother testified that she last called Mallory at approximately 4:50 p.m. Mother summarized this conversation with Mallory as follows:

> I asked him like, hey, how's the kids, do you or the kids need anything before I clock out of work? He told me, no, we don't need nothing, and the conversation kept going on until like me having to clock out. It lasted more than just a couple of minutes.

> He did tell me like, hey, I have a question for you. The odd question was does [S.E.] hum in her sleep, and I told him what do you mean by humming in her sleep? That doesn't make sense to me. He said, well, she took a nap, she has been taking a nap for a while. And I'm like is she looking red in her face, and I'm like normally because she does cover her face. You should take [the blanket] off. She will be — like the redness will come down. He told me he did take it off, but she wasn't responding.

> * * *

> After a couple of times of me telling him to grab her, because you grabbing a child will wake her up or just call her name. She wasn't responding. I told him call 911, just hang up on me, and I ran out of work and was on my way.

(Tr. 411-412.)

{¶ 7} Mallory called 911 at approximately 5:23 p.m. The eight-minute 911 call was played for the jury in its entirety. (Tr. 370.) During the 911 call, Mallory informed the 911 operator that he learned from his son that S.E. fell on a toy while she was playing with the other children. (Tr. 372-373.)

{¶ 8} Emergency medical services arrived at the home at approximately 5:31 p.m. and discovered S.E. unresponsive in an upstairs bedroom. Matthew Kalas ("Kalas"), a firefighter and paramedic employed by the city of Euclid, testified that S.E. had a "golf ball size hematoma to the left side of her forehead and a smaller hematoma to the right side as well." (Tr. 242.) According to Kalas, the adult male present at the scene expressed that S.E. was "playing and tripped on a toy and hit her forehead on the floor." (Tr. 242.) Kalas further testified that another "EMS member on the scene was told by an additional child that [S.E.] fell off the bed and hit her head." (Tr. 242.)

{¶ 9} Patrolman Samuel J. Thirion ("Officer Thirion") of the city of Euclid Police Department testified that he responded to Mallory's home after receiving a dispatch for "an 18-month-old female who was breathing and unresponsive." (Tr. 266.) Officer Thirion testified that when he arrived at the scene, S.E. was quickly removed from the home by the EMS first responders for further emergency care. Officer Thirion stated that he remained at the scene and separately spoke with Mallory, J.M., and Su.E. According to Officer Thirion, Mallory reported that S.E. had tripped over a Nerf gun and hit her head on the floor. Officer Thirion testified that Mallory was "just very flat, not very emotional." (Tr. 273.) In turn, J.M. and Su.E. stated that S.E. "fell off the bed." (Tr. 274.)

{¶ 10} S.E. was transported to University Hospitals Rainbow Babies and Children's Hospital at approximately 5:50 p.m. Once at the hospital, doctors determined that S.E. sustained a significant brain bleed, leading to a subdural

hematoma causing a midline shift of the brain. Due to her extensive injuries, Dr. Krystal Tomei ("Dr. Tomei") attempted a hemicraniectomy to relieve pressure on S.E.'s brain. The procedure required surgeons to remove a portion of S.E.'s skull to allow the brain room to swell and to evacuate the blood clot. Dr. Tomei confirmed that time was of the essence because "as time goes by, the situation becomes worse and worse unless you can hope to relieve the pressure." (Tr. 619.) Despite the emergency efforts of the surgeons, however, S.E. succumbed to her injuries and died on July 31, 2020.

{¶ 11} Mother testified that while S.E. was being treated in the hospital, she contacted Mallory in an effort to determine the cause of S.E.'s injuries. According to Mother, Mallory stated

> that [S.E.] fell off the bed jumping — when [Su.E.] and [J.M.] were playing on the bed, [S.E.] jumped off the bed and hit her head on the Nerf gun.

(Tr. 415.) Subsequently, however, Mother began to press Mallory for the truth because "it wasn't making sense * * * especially when the doctors tell you whatever the reason that was given at the beginning, that cannot cause her injuries, so I'm confused." (Tr. 421.) Mother testified that Mallory initially maintained that S.E. "fell off the bed," but later stated that "she fell in the shower." (Tr. 421.) Following this conversation, Mother blocked Mallory's phone number and did not engage in further conversations with him.

{¶ 12} Mallory's younger brother, T.W. testified on behalf of the state. He testified that he was in the home with Mallory and the young children until he left

to play basketball at approximately 4:00 p.m. T.W. stated that at the time he went upstairs to tell Mallory that he was leaving, S.E. was with Mallory and was "just playing on the bed laughing." (Tr. 346.) When T.W. came home at approximately 5:30 p.m., he learned that S.E. had been injured. T.W. testified that he asked Mallory what had happened and Mallory responded "that [S.E.] — they was all upstairs playing on the bed and she hit her head on top of a Nerf gun." (Tr. 349.)

{¶ 13} Detective Jennifer Kroczak ("Det. Kroczak") of the city of Euclid Police Department, testified that she was assigned to investigate the circumstances of S.E.'s injuries. In the course of her investigation, Det. Kroczak reviewed Mallory's 911 call, took photographs of the pertinent rooms inside Mallory's home, collected the toy that was alleged to have caused S.E.'s injuries, obtained written statements from the firefighters and paramedics who provided emergency care inside Mallory's home, spoke with various members of the medical staff at University Hospitals, and conducted multiple interviews with Mallory and Mother.

{¶ 14} Det. Kroczak testified that her initial conversations with Mother and Mallory occurred while S.E. was receiving medical care. During these conversations, Mother expressed that she was at her place of employment at the time S.E. was injured but had communicated with Mallory on several occasions throughout the day. In turn, Mallory confirmed that he was in the home at the time S.E. was injured. Det. Kroczak testified, however, that Mallory provided inconsistent statements concerning the cause of S.E.'s injuries. She explained as follows:

There were versions provided that the child slipped and fell on the toy or that she fell off the bed and hit the toy. The differences were not major, but I was not getting the same consistent version repeatedly.

(Tr. 633.)

{¶ 15} On July 27, 2020, Mallory was voluntarily transported to the police station to make a written statement. In the statement, Mallory indicated that he heard a boom at approximately 4:30 or 4:45 p.m. and then discovered S.E. on the floor. Once the statement was completed, Mallory was free to leave the station.

{¶ 16} On July 28, 2020, Det. Kroczak spoke with S.E.'s treating physician, Dr. Lolita McDavid, who opined that the magnitude of S.E.'s brain injuries were "not consistent with the explanation provided for injury." (Tr. 644.) In light of this information, Det. Kroczak accompanied Jessica Lecastre ("Lecastre"), a special investigator employed by the Cuyahoga County Division of Children and Family Services, to Mallory's home for additional questioning on July 29, 2020. Lecastre testified that the purpose of the home visit was to follow up on a referral made to the agency concerning a near fatality of a child.

{¶ 17} According to Lecastre, Mallory reported that he allowed S.E. to play with older children in their playroom at approximately 4:45 p.m. Mallory later heard a "bump in the room." When he went into the playroom to check on the children, he picked S.E. up and noticed that she had a mark on her head. Mallory then took S.E. to his bedroom and placed her on his bed. When Mallory came back into the bedroom after using the bathroom, he found S.E. "unresponsive laying

down with a blanket over her face." (Tr. 465.) Mallory informed Lecastre that the other children told him that S.E. had "fell on a Nerf gun off of the bed." (Tr. 465.)

{¶ 18} Det. Kroczak testified that while she was in Mallory's home on July 29, 2020, she was permitted to take additional photographs of the children's bedrooms. In pertinent part, Det. Kroczak provided context for the photographs she took of the bed located inside the children's playroom "where the fall was alleged to have occurred from one of [Mallory]'s versions of the story." (Tr. 650.) Det. Kroczak testified that the distance between the top of the mattress and the ground was no higher than her knee.

{¶ 19} Det. Kroczak testified that the demeanor of her investigation shifted once she was notified of S.E.'s death on July 30, 2020. Det. Kroczak testified that once the manner and cause of death was confirmed following S.E.'s autopsy, Mallory was brought into the police department for additional questioning on August 5, 2020. Pertinent portions of the recorded interviews were played for the jury. During the interview, Mallory discussed the events leading to S.E.'s injuries, including his own interactions with the child. At the conclusion of the interview, Mallory was notified that he was being booked in county jail.

{¶ 20} On August 7, 2020, Mallory contacted Det. Kroczak and expressed that he wished to discuss the circumstances of S.E.'s injuries further. On this occasion, Mallory continuously expressed that he loved S.E. like she was his own and that he did not do anything to hurt her. He denied all insinuations that he was unable to control S.E. or otherwise hurt her because she was being inconsolable.

Mallory reiterated that he heard S.E. fall while playing with the other children and that she had a knot on her head. However, he further suggested that S.E. may have subsequently hit her head on a side table while they were playing peekaboo on his bed. Finally, when asked why he did not immediately contact 911 once he realized S.E. was unresponsive, Mallory stated that he was concerned that he could not answer questions posed by the 911 operator, such as S.E.'s "last name and stuff like that." State's exhibit No. 148.

{¶ 21} Dr. Joseph Felo ("Dr. Felo") of the Cuyahoga County Medical Examiner's Office testified that he performed S.E.'s autopsy and generated a report that summarized his findings and conclusions. Dr. Felo testified that S.E. had a number of observable, external injuries, including a large bruise on the right side of her scalp, as well as scattered bruising on her face, torso, left arm, right hip, knees, and back. Dr. Felo stated that the medical examiners also observed a number of internal injuries, including "overwhelming damage to the brain." (Tr. 705.) Specifically, the autopsy revealed bleeding on the surface of the brain, dead brain tissue, brain tissue in the spinal cord, blood in the cervical nerve roots, bilateral retinal hemorrhages, secondary hemorrhages in the spinal cord, and infections in the lungs. When presented with images of S.E.'s spinal cord, Dr. Felo explained that her spinal cord was red "because there is blood that has extended from around the right side of her brain and just gone down the spinal cord[.]" (Tr. 603.) Dr. Felo opined that the injuries sustained to the spinal cord area "indicate that there was

some sort of a whiplash or a forward and backwards rotation of the head on the spine tearing the brain — tearing the tissues off the spinal cord." (Tr. 704.)

{¶ 22} Based on his participation in S.E.'s autopsy, Dr. Felo concluded to a degree of reasonable medical certainty that S.E.'s cause of death was "anoxic encephalopathy, cerebral edema and cerebral necrosis that is due to a subdural hematoma that is due to blunt injuries of head, torso, and extremities." (Tr. 710.) Dr. Felo explained as follows:

> Anoxic encephalopathy means the brain is starved of oxygen, and the brain is starved of oxygen because of swelling in the brain, and that is what cerebral edema is, swelling in the brain, and a combination of those two results in tissue death of the brain, and that is cerebral necrosis. All of that happened because she had bleeding on the surface of the brain, and that is what the subdural hematoma is. That's bleeding on the surface of the brain. What caused that bleeding on the brain is blunt trauma to her head.
>
> * * *
>
> Blunt trauma is anything that the head came in contact with which was a solid instrument or object with enough force to leave a mark, and in her case it was a bruise, bruises on her face, but most importantly the bruise on the side of her right scalp and that bruising with enough force cause the internal bleeding on the surface of [her] brain.

(Tr. 710-711.) Given the nature and extent of her injuries, Dr. Felo classified S.E.'s manner of death as a homicide.

{¶ 23} Dr. Joshua Friedman ("Dr. Friedman") testified that he is a board-certified pediatrician and is currently employed by MetroHealth Medical Center as a child advocacy provider. Based on his experience and expertise in the field of pediatric medicine, Dr. Friedman was asked by the Cuyahoga County Division of Child and Family Services to render a conclusion as to the nature and extent of S.E.'s

injuries. Based on his review of S.E.'s medical records, Dr. Friedman rendered the ultimate conclusion that S.E. "passed away from injuries she sustained during abusive head trauma." (Tr. 521.) Dr. Friedman explained that the phrase "abusive head trauma" represents "injuries inside a child's head that have been caused by trauma that cannot be explained by any other mechanism than someone harming the child." (Tr. 521.) In support of his opinion that S.E.'s injuries were sustained as a result of abuse and not an accident, Dr. Friedman noted, among other impressions, that the extent of the tears in S.E.'s brain would have required "significant forces" and could not be caused by "common forces," such as "things that children get from their play or routine accidents of short distance falls." (Tr. 539.) Rather, such tears "occur in things like motor vehicle accidents, significant multistory falls, and other very forceful situations." (Tr. 539-540.) Similarly, Dr. Friedman testified that the nature of damage caused to S.E.'s retinal membranes are typically "described in serious crush injuries, they're described in motor vehicle accidents, and they're described in abusive head trauma. When children are handled with such significant forces, it was caused by someone who meant to harm them." (Tr. 543.) Accordingly, Dr. Friedman opined to a reasonable degree of medical certainty "that the injury [S.E.] suffered was a non-accidental trauma." (Tr. 548.)

{¶ 24} At the conclusion of the jury trial, Mallory was found guilty of involuntary manslaughter and endangering children as charged in Counts 5 and 6 of the indictment. However, Mallory was found not guilty of aggravated murder and felonious assault as charged in Counts 1 and 3 of the indictment. In addition, the

jury was unable to reach a decision of guilt or no guilt as to the murder and endangering children offenses charged in Counts 2 and 4 of the indictment. Once the jury was discharged, the trial court found Mallory guilty of domestic violence as charged in Count 7 of the indictment, stating:

> The court finds beyond a reasonable doubt that Mr. Mallory is guilty of domestic violence in Count 7 as charged, that he did knowingly cause physical harm to [S.E.], a family or household member, and, furthermore, that he previously pled guilty on or about February 7, 2020, in the Court of Common Pleas of Cuyahoga County case number 19-644206 *to felonious assault and domestic violence.*

(Emphasis added.) (Tr. 870.)

{¶ 25} Prior to sentencing, Mallory agreed to enter into a negotiated plea agreement with the state in an effort to resolve Counts 2 and 4 of the indictment. Under the terms of the plea agreement, Mallory agreed to plead guilty to endangering children as charged in Count 4 of the indictment. Mallory further agreed to a sentence of four years on Count 4, to run consecutive to an agreed-upon sentence of 11 years on Count 5, involuntary manslaughter. (Tr. 872-873.) In exchange for his plea, the state agreed to dismiss Count 2 of the indictment. Following a Crim.R. 11 colloquy, the trial court accepted Mallory's plea and found him guilty of endangering children, a felony of the second degree.

{¶ 26} At sentencing, the trial court imposed the agreed-upon four-year prison term on the endangering children offense charged in Count 4 of the indictment, an 11 to 16.5-year prison term on the involuntary manslaughter offense charged in Count 5 of the indictment, a three-year prison term on the endangering

children offense charged in Count 6 of the indictment, and an 18-month prison term on the domestic violence offense charged in Count 7 of the indictment. The sentences imposed in Counts 4 and 5 were ordered to run consecutively to each other. The remaining prison terms were ordered to run concurrently.

{¶ 27} Mallory now appeals from his convictions and sentence.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 28} In his first, second, and third assignments of error, Mallory argues the evidence was insufficient to support his convictions for domestic violence, endangering children, and involuntary manslaughter.

{¶ 29} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 30} "'Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, 86 N.E.3d 1032, ¶ 35

(8th Dist.), quoting *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18. Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *Id.*, citing *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Further, circumstantial evidence is not only sufficient, "'"but may also be more certain, satisfying, and persuasive than direct evidence.'"" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 31} With this standard in mind, we separately address Mallory's convictions for domestic violence, endangering children, and involuntary manslaughter.

### 1. Domestic Violence

{¶ 32} In this case, Mallory was convicted of domestic violence in violation of R.C. 2919.25(A), which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶ 33} Generally, a violation of R.C. 2919.25(A) is a misdemeanor of the first degree. R.C. 2919.25(D)(2). In this case, however, Mallory's domestic violence conviction contained a furthermore specification that elevated his conviction to a felony of the fourth degree pursuant to R.C. 2919.25(D). Pertinent to this appeal, R.C. 2919.25(D)(3) provides that a violation of R.C. 2919.25(A) or (B) is a felony of the fourth degree

if the offender previously has pleaded guilty to or been convicted of domestic violence, *a violation of an existing or former ordinance or law of this or any other state or the United States that is substantially similar to domestic violence*, a violation of section 2903.14 [negligent assault], 2909.06 [criminal damaging], 2909.07 [criminal mischief], 2911.12 [burglary], 2911.211 [aggravated trespass], or 2919.22 [endangering children] of the Revised Code if the victim of the violation was a family or household member at the time of the violation, a violation of an existing or former municipal ordinance or law of this or any other state or the United States that is substantially similar to any of those sections if the victim of the violation was a family or household member at the time of the commission of the violation, *or any offense of violence if the victim of the offense was a family or household member at the time of the commission of the offense*[.]

(Emphasis added.) R.C. 2919.25(D)(3). It is well settled that "[w]hen a prior conviction elevates a misdemeanor to a felony, 'the prior conviction is an essential element of the crime, and [it] must be proved by the state.'" *State v. Tate*, 138 Ohio St.3d 139, 2014-Ohio-44, 4 N.E.3d 1016, ¶ 17, quoting *State v. Allen*, 29 Ohio St.3d 53, 506 N.E.2d 199 (1987).

{¶ 34} On appeal, Mallory does not dispute that the state presented sufficient evidence to support his conviction under R.C. 2919.25(A). However, Mallory argues that the state failed to present sufficient evidence to warrant the enhancement of the domestic violence conviction to a felony of the fourth degree. Mallory acknowledges that the state introduced the journal entry of his prior conviction for assault in Cuyahoga C.P. No. CR-19-664206-A. However, he contends that the journal entry did not specify that the victim in the case was a family or household member. Mallory therefore maintains that his domestic violence conviction must be modified to a misdemeanor of the first degree.

{¶ 35} In contrast, the state maintains that the enhancement of the conviction was warranted because the offense of assault is "substantially similar" to the offense of domestic violence. Thus, the state contends that because defense counsel did not object to the court's finding of guilt, "all parties were under the impression that Mallory's previous conviction was to be a substantially similar offense in accordance with R.C. 2919.25."

{¶ 36} Our duty when construing a statute is to determine and give effect to the intent of the General Assembly as expressed in the language it enacted. *Griffith v. Aultman Hosp.*, 146 Ohio St.3d 196, 2016-Ohio-1138, 54 N.E.3d 1196, ¶ 18; *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 20. "When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said." *Jones v. Action Coupling & Equip., Inc.*, 98 Ohio St.3d 330, 2003-Ohio-1099, 784 N.E.2d 1172, ¶ 12, citing *Symmes Twp. Bd. of Trustees v. Smyth*, 87 Ohio St.3d 549, 553, 721 N.E.2d 1057 (2000).

{¶ 37} "Where a statute defines terms used therein, such definition controls in the application of the statute * * *." *Good Samaritan Hosp. of Dayton v. Porterfield*, 29 Ohio St.2d 25, 30, 278 N.E.2d 26 (1972), citing *Terteling Bros., Inc. v. Glander*, 151 Ohio St. 236, 85 N.E.2d 379 (1949), and *Woman's Internatl. Bowling Congress, Inc. v. Porterfield*, 25 Ohio St.2d 271, 267 N.E.2d 781 (1971). Terms that are undefined in a statute are accorded their common, everyday meaning. *See* R.C. 1.42.

{¶ 38} With respect to the state's position on appeal, the term "substantially similar" is not defined by the Ohio Revised Code. In an effort to assess the ordinary meaning of the term "substantially similar" as applied in R.C. 2919.25, the Second District has noted that the term is "close to 'substantially equivalent.'" *State v. Karns*, 2d Dist. Greene No. 2020-CA-35, 2021-Ohio-1836, ¶ 31. Generally, the term "substantially equivalent" is defined as ""being largely but not wholly that which is specified.""" *State v. Lloyd*, 132 Ohio St.3d 135, 2012-Ohio-2015, 970 N.E.2d 870, ¶ 28, quoting *Swan Creek Twp. v. Wylie & Sons Landscaping*, 168 Ohio App.3d 206, 2006-Ohio-584, 859 N.E.2d 566, ¶ 28 (6th Dist.), quoting *Merriam Webster's Collegiate Dictionary* 1174 (10th Ed.1996). "'Substantially' is the operative word." *Id.*

{¶ 39} After careful consideration, we find no merit to the state's contention that the offense of assault, as defined by R.C. 2903.13, is substantially similar to the offense of domestic violence such as to warrant the enhancement of the degree of Mallory's domestic violence conviction in this case. There is no dispute that the offenses of domestic violence and assault each require the state to prove that the defendant knowingly caused or attempted to cause physical harm to another. The offenses are identical in this regard. However, it is equally well established that the involvement of a "family or household member" is an essential element of the offense of domestic violence. The defendant's relationship with the victim is the substantial aspect of a domestic violence conviction. This distinction between the offenses of assault and domestic violence is critical and precludes any determination

that the offenses are substantially similar or equivalent for the purposes of enhancement under R.C. 2919.25(D)(3). To accept the state's position would greatly increase the scope of R.C. 2919.25(D)(3)-(4), and would be inconsistent with the statute's clear intent to penalize those offenders who have a history of committing specified criminal acts against family or household members.

{¶ 40} Our conclusion is further supported by language of R.C. 2919.25(D)(3), which specifically addresses the manner in which a prior assault conviction could elevate a violation of R.C. 2919.25(A) to a felony offense. As stated, the statute provides that the enhancement in the degree of the offense is also warranted if "the offender previously has pleaded guilty to or been convicted of * * * any offense of violence if the victim of the offense was a family or household member at the time of the commission of the offense[.]" As applicable in this case, R.C. 2901.01(A)(9)(a) defines assault as an offense of violence for purposes of the Ohio Revised Code. It therefore follows that an offender's prior assault conviction can only be used to elevate a violation of R.C. 2919.25(A) to a felony of the fourth degree pursuant to R.C. 2919.25(D)(3) where the victim of the prior offense was "a family or household member at the time of the commission of the offense."

{¶ 41} Based on the foregoing, we agree with Mallory that in order to elevate his domestic violence conviction to a felony of the fourth degree pursuant to R.C. 2919.25(D)(3), the state was required to prove that his prior assault conviction was committed against a family or household member. In this case, the state attempted to satisfy its burden of proof by submitting State's exhibit No. 152, a journal entry

reflecting Mallory's prior conviction for assault in Cuyahoga C.P. No. CR-19-644206-A. The journal entry provides, in pertinent part:

> On a former day of court the defendant plead[ed] guilty to assault 2903.13(A) M1 as amended in Count(s) 1 of the indictment.
>
> Count(s) 2 was/were nolled.[1]

{¶ 42} At the time the journal entry was admitted, there was no stipulation on the record as to who the victim was in Case No. CR-19-644206-A. This court has previously held that if, for instance, a defendant had previously been convicted of domestic violence then their stipulation to being the defendant in a previous case is sufficient evidence to enhance an offense under this statute. *State v. Williams*, 8th Dist. Cuyahoga No. 84040, 2004-Ohio-6418. "That logic does not extend to the present situation. The identity of the defendant was not the only fact at issue; the relationship to the victim was an essential element that must be proved." *State v. Sanders*, 8th Dist. Cuyahoga No. 107253, 2019-Ohio-1524.

{¶ 43} Under these circumstances, we find this case to be analogous to those presented in *State v. Crenshaw*, 8th Dist. Cuyahoga No. 108830, 2020-Ohio-4922. In *Crenshaw*, the defendant was convicted of endangering children in violation of R.C. 2919.22(B)(1), a second-degree felony; endangering children in violation of

---

[1] Contrary to the clear language of the journal entry in Case No. CR-19-644206-A., the trial court in this case perpetuated the mischaracterization of Mallory's former plea by stating that the furthermore clause attached to Count 7 was proven where Mallory "previously pled guilty on or about February 7, 2020, in the Court of Common Pleas of Cuyahoga County case number 19-644206 to felonious assault and domestic violence." (Tr. 870.) Contrary to the court's statement, the journal entry reflects that the felonious assault offense (Count 1) was amended to the offense of assault and the domestic violence offense (Count 2) was dismissed.

R.C. 2919.22(A), a third-degree felony; and domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor. As to the domestic violence conviction, the defendant was further convicted of a "furthermore clause" that stated:

> FURTHERMORE, the offender previously had pleaded guilty to or been convicted of Aggravated Assault on or about December 19, 2017, in the Court of Common Pleas, Cuyahoga County, Ohio, Case No. CR17-620327.

{¶ 44} On appeal, the defendant argued that the trial court erred in elevating her domestic violence conviction to a felony of the fourth degree because the state failed to establish that her prior aggravated assault conviction was an enhancing offense. Specifically, the defendant maintained that the state did not submit any evidence to establish that her aggravated assault conviction victimized a family or household member. This court found merit to the defendant's argument, noting that although the defendant stipulated that she was the defendant in the aggravated assault case, there was nothing in the record to support the state's assertion that it was understood that her prior conviction was committed against her husband. *Id.* at ¶ 75-81. In finding the state failed to provide sufficient evidence to prove that the defendant's conviction should be enhanced pursuant to R.C. 2919.25(D)(3), this court explained as follows:

> Here, we cannot simply take the state's word in an appellate brief that Crenshaw perpetrated her aggravated assault against her family member. It may have been the intention of Crenshaw and her attorney to stipulate to that fact but we cannot rely on conjecture when it comes to proving an essential element of the crime.
>
> There is nothing in this record that indicates that the victim of the aggravated assault was a family member. Crenshaw did not stipulate

to that fact. As a result, we cannot find that the enhancing offense was proven.

*Id.* at ¶ 82-83.

{¶ 45} As in *Crenshaw*, there is nothing before this court to conclude that Mallory's prior assault conviction was committed against a family or household member. The journal entry submitted in support of the furthermore clause attached to Count 7 is silent on this matter and we may not presume the identity of the victim in the absence of credible evidence or a stipulation by the parties. Thus, although Mallory concedes that there was sufficient evidence supporting his domestic violence conviction, we find there was insufficient evidence to warrant the enhancement of the offense to a felony of the fourth degree pursuant to R.C. 2919.25(D)(3). Mallory's conviction for domestic violence must be modified to reflect the lesser degree on which conviction was appropriate, i.e., a misdemeanor of the first degree. *See State v. Easterling*, 2d Dist. Green No. 2018-CA-33, 2019-Ohio-2470, ¶ 73.

{¶ 46} Mallory's first assignment of error is sustained.

### 2. Endangering Children

{¶ 47} In this case, Mallory was convicted of endangering children in violation of R.C. 2919.22(A). He further pleaded guilty to an additional count of endangering children in violation of R.C. 2919.22(B)(1). R.C. 2919.22 provides, in pertinent part:

> (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen

years of age * * *, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *

(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:

(1) Abuse the child[.]

{¶ 48} To support a conviction for child endangering under R.C. 2919.22(A), there must be sufficient evidence that the defendant (1) recklessly (2) created a substantial risk to the health or safety of one or more children (3) by violating a duty of care, protection or support. *Cleveland Hts. v. Cohen*, 2015-Ohio-1636, 31 N.E.3d 695, ¶ 25 (8th Dist.). Pursuant to R.C. 2901.22(C), "[a] person acts recklessly when, with heedless indifference to the consequences, he [or she] perversely disregards a known risk that his [or her] conduct is likely to cause a certain result, or is likely to be of a certain nature." "Substantial risk" is defined as a "strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶ 49} In distinguishing the neglect form of child endangering set forth in R.C. 2919.22(A) from the abuse form of the offense set forth in R.C. 2919.22(B)(1) and (2), the Ohio Supreme Court explained that "neglect is characterized by acts of omission rather than acts of commission" and abuse is characterized by "[a]ffirmative acts of torture, abuse, and excessive acts of corporal punishment or disciplinary measures." *State v. Kamel*, 12 Ohio St.3d 306, 309, 466 N.E.2d 860 (1984). "[A]n inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is

an offense under R.C. 2919.22(A)." *Id. See also State v. Stewart*, 5th Dist. Stark No. 2007-CA-00068, 2007-Ohio-6177, ¶ 59, citing *State v. Sammons*, 58 Ohio St.2d 460, 391 N.E.2d 713 (1979), and *Kamel*. ("R.C. 2919.22(A) is aimed at preventing acts of omission or neglect when the breach results in a substantial risk to the health or safety of a child.")

{¶ 50} Because he accepted guilt by entering a guilty plea, Mallory cannot challenge the evidence supporting his conviction pursuant to R.C. 2919.22(B)(1) (Count 4). Thus, Mallory focuses on his conviction pursuant to R.C. 2919.22(A) (Count 6), arguing that the state failed to introduce any evidence concerning an act of omission as required under R.C. 2919.22(B)(1). Mallory states that the prosecution "presented no evidence showing [he] failed to properly act after the accident."

{¶ 51} In contrast, the state argues there was sufficient evidence introduced at trial for a reasonable juror to conclude that Mallory created a substantial risk to the health and safety of the victim by engaging in neglectful behavior on the day of this incident. The state contends that even if Mallory's version of the events were to be believed, his statements demonstrated that he breached his duty of care, protection, and support by (1) failing to supervise S.E. at the time she was playing in a separate room, (2) leaving S.E. alone after she sustained her injuries, and (3) speaking with Mother rather than calling for emergency assistance.

{¶ 52} After careful review of the record, we agree with Mallory's assertion that the state presented no evidence to suggest that, if S.E.'s injuries were the result

of an accident, Mallory breached his duty of care to S.E. by failing to adequately supervise the children under his care. Throughout the pendency of trial, the state rejected any suggestion that S.E. was injured as a result of an accident by presenting ample evidence that her injuries required significant forces that could only be caused by someone who intended to cause serious physical harm. With that said, however, evidence tending to show that Mallory physically abused the minor victim does not preclude a finding that Mallory also committed acts of omission thereafter.

{¶ 53} In this case, S.E. sustained a number of readily apparent injuries to her head and body, including a "golf ball size hematoma to the left side of her forehead and a smaller hematoma to the right side as well." The critical nature of S.E.'s injuries were obvious. She was unresponsive, making strange noises, and in need of immediate emergency care. Rather than seeking timely medical care, however, Mallory unjustifiably disregarded a known risk to S.E.'s health by leaving her alone in a bedroom and failing to contact 911 until he was instructed to do so by his girlfriend — approximately 30 minutes into their phone conversation. Because of Mallory's delay, S.E. was not transported to the hospital until 5:50 p.m. — which Dr. Friedman estimated was several hours after the blunt-force trauma was initially inflicted. (Tr. 537.) By that time, however, S.E. had already sustained significant swelling in her brain due to bleeding on the surface of her brain. The progressive nature of S.E.'s injuries at the time she arrived at the hospital left the treating physicians with limited options and necessitated an emergency hemicraniectomy. As noted by Dr. Tomei, time was of the essence.

{¶ 54} Under the foregoing circumstances, we find a reasonable juror could conclude that Mallory, who was acting in loco parentis of the 18-month-old child, recklessly created a substantial risk to the health or safety of the child when he failed to timely seek medical attention for the victim child. *See State v. Boyd*, 8th Dist. Cuyahoga No. 108552, 2020-Ohio-3450, ¶ 27. Accordingly, we find sufficient evidence supported Mallory's endangering children conviction pursuant to R.C. 2919.22(A).

{¶ 55} Mallory's second assignment of error is overruled.

### 3. Involuntary Manslaughter

{¶ 56} Mallory was convicted of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree. The statute provides that "[n]o person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." The term "proximate result" used in R.C. 2903.04 mandates that a person will be criminally responsible for causing the death of another only where the consequences of his conduct are direct, normal, and reasonably inevitable when viewed in the light of ordinary experience. *State v. Sabatine*, 64 Ohio App.3d 556, 560, 582 N.E.2d 34 (8th Dist.1989), citing *State v. Losey*, 23 Ohio App.3d 93, 95, 491 N.E.2d 379 (10th Dist.1985), and *State v. Chambers*, 53 Ohio App.2d 266, 272, 373 N.E.2d 393 (9th Dist.1977).

{¶ 57} In this case, Count 5 of the indictment alleged that S.E.'s death was the proximate result of Mallory committing or attempting to commit the felony offense

of endangering children in violation of R.C. 2919.22(A) "and/or" domestic violence in violation of R.C. 2919.25.

{¶ 58} Consistent with his previous arguments, Mallory contends that because the predicate-felony convictions of endangering children (Count 6) and domestic violence (Count 7) are not supported by sufficient evidence, this court is required to find insufficient evidence supporting his involuntary manslaughter conviction. Alternatively, Mallory contends that "even if one of the two predicates in this case is determined by this court to serve as sufficient evidence to support the manslaughter charge, if the other is not the conviction must be vacated." Mallory states that where, as here, alternative-predicate offenses underlie the offense of involuntary manslaughter, the state is required to prove each alternative means beyond a reasonable doubt. In support of his position, Mallory relies on the Ohio Supreme Court's decisions in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, and *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127.

{¶ 59} In *Gardner*, the plurality opinion of the Ohio Supreme Court stated, "[a]lthough Crim.R. 31(A)[2] requires juror unanimity on each element of the crime, jurors need not agree to a single way by which an element is satisfied." *Id*. at ¶ 38, citing *Richardson v. United States*, 526 U.S. 813, 817, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999). Regarding the alternative predicate offenses alleged to have supported

---

[2] Crim.R. 31(A) provides that a criminal "verdict shall be unanimous. It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in open court."

Mallory's involuntary manslaughter conviction in this case, *Gardner* clarified its holding as follows:

> In determining whether the state has impermissibly interfered with a defendant's Crim.R. 31(A) right to juror unanimity and the due process right to require that the state prove each element of the offense beyond a reasonable doubt, the critical inquiry is whether the case involves "alternative means" or "multiple acts."
>
> """In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to guilt for the single crime charged. Unanimity is not required, however, as to the means by which the crime was committed so long as substantial evidence supports each alternative means. *In reviewing an alternative means case, the court must determine whether a rational trier of fact could have found each means of committing the crime proved beyond a reasonable doubt.*"""

(Emphasis added.) *Id.* at ¶ 48-49, quoting *State v. Jones*, 96 Hawai'i 161, 170, 29 P.3d 351 (2001), quoting *State v. Timley*, 255 Kan. 286, 289-290, 875 P.2d 242 (1994), quoting *State v. Kitchen*, 110 Wash.2d 403, 410, 756 P.2d 105 (1988).

{¶ 60} Although *Gardner* was a plurality opinion, the Ohio Supreme Court's subsequent decision in *Adams* makes it clear that the court still adheres to the juror unanimity rule stated in *Gardner*. *See State v. McKinney*, 8th Dist. Cuyahoga No. 106377, 2019-Ohio-1118, ¶ 31. In *Adams*, the court was asked to address whether there was sufficient evidence supporting the defendant's capital specification pursuant to R.C. 2929.04(A)(7). The court noted that "the sole aggravating circumstance in [the defendant's] case was framed in terms of alternative means: a single crime (aggravated murder) that might have been committed in any of four ways (murder in the course of rape, kidnapping, aggravated robbery, or aggravated

burglary)." *Id.*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 273.

Consistent with *Gardner*, the court stated as follows:

> To find that the R.C. 2929.04(A)(7) specification has been proved when more than one predicate offense is alleged, the jury must unanimously find beyond a reasonable doubt that the defendant committed aggravated murder during the course of one or more of the alleged predicate offenses, but the jury need not unanimously agree on which predicate offense was committed.
>
> In a case such as this one, jury unanimity is not required as to the means underlying the capital specification so long as substantial evidence supports each alternative means.

*Id.* at ¶ 273-274, citing *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 49. Although *Adams* involved the review of the evidence supporting a capital specification, it summarized its application of *Gardner* as follows:

> The state assumed the burden of producing sufficient evidence as to each of the alternative means of the R.C. 2929.04(A)(7) specification here, given the way the omnibus capital specification was presented to the jury. Accordingly, the principles we apply can be stated as follows: In an appeal of a death sentence based on an R.C. 2929.04(A)(7) specification when more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed, a reviewing court must determine under R.C. 2929.05(A) whether there is sufficient evidence to support each of the alternative predicate-offense theories. The appellate court must determine whether a rational trier of fact could have found each means of committing the crime of aggravated murder in the course of the alleged R.C. 2929.04(A)(7) predicate offenses proved beyond a reasonable doubt. When an appellate court reviews the sufficiency of the evidence pursuant to R.C. 2929.05(A) as to the R.C. 2929.04(A)(7) aggravating circumstance in an aggravated-murder case in which more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed, and the appellate court determines that the state proved some but not all of the alleged predicate offenses that could establish the aggravating circumstance, the evidence is, as a matter of law, insufficient to support a death sentence and the death sentence must be vacated.

*Id.* at ¶ 275.

{¶ 61} Applying its standard to the facts before it, the *Adams* Court determined that although the state presented sufficient evidence to establish the predicate offenses of rape, kidnapping, and aggravated robbery, there was insufficient evidence supporting the predicate offense of aggravated burglary. Thus, the court concluded that it was

> compelled to hold that the state's success in proving some of the alternative means cannot make up for its failure to prove all the suggested means by which Adams may have committed the aggravating circumstance. *Gardner*, 118 Ohio St. 3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 49. Because the state failed to produce sufficient evidence to prove all elements of aggravated burglary, we find insufficient evidence to support the finding on the R.C. 2929.04(A)(7) capital specification.

*Id.* at ¶ 288. Accordingly, the *Adams* Court vacated the defendant's sentence of death and remanded the case to the trial court for a new sentencing hearing.

{¶ 62} In reaffirming the principle that "each possibility in an alternative-means case must be supported by sufficient evidence," *Adams* declined to abandon the holding of *Gardner* in favor of the rule adopted by the United States Supreme Court in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). In explaining its position, the lead opinion stated, in relevant part:

> *Griffin* held that in federal prosecutions, a general verdict based on alternative means will be sustained if the evidence warrants a guilty verdict on one theory of guilt, even if there is insufficient evidence of guilt as to an alternative theory. *Id.* at 56-57. *Griffin* was premised on a dubious assumption of juror infallibility: the jury will always disregard an unproven theory and convict only on the proven theory.
>
> The *Griffin* assumption defies experience and common sense. As the Supreme Judicial Court of Massachusetts explained, "[i]f the premise

of the Supreme Court's position were correct, a jury would never return a guilty verdict when the evidence was insufficient to warrant that verdict, and we know that is not so." *Commonwealth v. Plunkett*, 422 Mass. 634, 640, 664 N.E.2d 833 (1996). When the Supreme Court of California adopted *Griffin* with modifications, one justice who did not accept the court's reasoning thoroughly dissected *Griffin*:

First, the premise of jury "infallibility" is unsupported. Jurors may be "well equipped" to determine pure questions of fact. But their expertise does not extend to mixed questions of law and fact—which include the sufficiency of the evidence. Second, the premise of jury "infallibility" is subversive. If it obtained, we would be compelled to dismiss at the very threshold each and every insufficient-evidence claim raised against any verdict of guilt. For we would then be required to conclude that if the evidence had indeed been lacking, the jury would necessarily have discerned the deficiency and could not possibly have rendered a guilty verdict. Thus, the bare fact of the verdict would establish the sufficiency of the evidence as a matter of law.

*People v. Guiton*, 4 Cal.4th 1116, 1132-1133, 17 Cal.Rptr.2d 365, 847 P.2d 45 (1993) (Mosk, J., concurring in judgment only). This illogical result is precisely what the separate opinion of Justice O'Donnell urges this court to adopt.

*Id*. at ¶ 291-292.

{¶ 63} In accordance with the directives of *Gardner* and *Adams*, the first question we must answer is whether sufficient evidence supported each of the two alternative means submitted to the jury in relation to the offense of involuntary manslaughter. Here, the jury was instructed to convict Mallory of involuntary manslaughter in violation of R.C. 2903.04(A) if it found "[Mallory] did cause the death of [S.E.] and such death was the proximate result of [Mallory] committing or attempting to commit the felony offense of endangering children and/or domestic

violence."[3] (Tr. 804.) As previously stated, we find sufficient evidence existed to support the predicate-felony offense of child endangering pursuant to R.C. 2919.22(A). However, because there was insufficient evidence supporting the furthermore clause attached to the domestic violence offense charged in Count 7 of the indictment, the evidence was insufficient to enhance Mallory's domestic violence conviction from a misdemeanor to a felony of the fourth degree. Under these circumstances, the jury could not have found that S.E.'s cause of death was the proximate result of Mallory committing or attempting to commit the *felony offense* of domestic violence.

{¶ 64} Based on the foregoing, we find the state failed to produce sufficient evidence to prove the alternative means offense of felony domestic violence. With that said, however, we find no merit to Mallory's contention that his involuntary manslaughter conviction must be vacated on sufficiency grounds — thereby warranting the attachment of double jeopardy. To the contrary, we find the evidence, when viewed in a light most favorable to the state, would permit a reasonable trier of fact to conclude that Mallory caused the death of S.E. as a proximate result of his commission of the felony offense of endangering children. Accordingly, the evidence, including the permissible inferences to be drawn therefrom, was sufficient to sustain Mallory's conviction for a violation of R.C. 2903.04(A). *See State v. Rawson*, 10th Dist. Franklin No. 14AP-1023, 2016-Ohio-

---

[3] Contrary to the state's assertion on appeal, the fact that the domestic violence offense charged in Count 7 of the indictment was tried to the bench does not mean that "there were no predicate, alternative theories before [the jury]."

1403 (reversing for new trial for failure to prove each alternative means by sufficient evidence but finding sufficient evidence supported base offense for the purposes of double jeopardy); *State v. Hinzman*, 8th Dist. Cuyahoga No. 92767, 2010-Ohio-771, ¶ 37 (reversing for new trial for failure to prove each alternative means by sufficient evidence).

{¶ 65} In declining to overturn the involuntary manslaughter conviction on sufficiency grounds, we note that Mallory has provided no case law to suggest that *Gardner* and *Adams* mandate the conclusion that where the state fails to prove each of the alternative means supporting a base offense beyond a reasonable doubt, a reviewing court is bound to find the base offense is not supported by sufficient evidence. The analysis set forth in *Gardner* was limited to an assessment of "whether jurors must agree unanimously as to which criminal offense a defendant intended to commit during a burglary." *Gardner*, 118 Ohio St. 3d 420, 2008-Ohio-2787 at ¶ 37, 889 N.E.2d 995. In fact, Ohio courts have expressly recognized that "[t]he Supreme Court's ruling in *Gardner* is based on Crim.R. 31(A), rather than constitutional due process considerations." *Rawson*, 10th Dist. Franklin No. 14AP-1023, 2016-Ohio-1403, ¶ 21, citing *Gardner* at ¶ 35 ("[T]his opinion will proceed on the understanding that unanimity in a juror verdict in state courts is not protected by the federal Constitution."). In turn, *Adams* concerned the sufficiency of the evidence supporting the defendant's capital specification. Although the court declined to consider the sufficiency of the defendant's underlying aggravated-murder conviction because the defendant did not raise the issue within his appeal,

we will not presume the court would have vacated the defendant's conviction on sufficiency grounds had the issue been before the court.

{¶ 66} Accordingly, although Mallory labels this assignment of error as a challenge to the sufficiency of the evidence, we find Mallory's citations to *Gardner* and *Adams,* as well as the arguments presented herein, are more akin to a Crim.R. 31(A) challenge. *See Orr v. Hayes*, 7th Dist. Mahoning No. 02 CA 27, 2002-Ohio-7441, 7 (courts look at the content of the document to determine its nature; not titles or labels). The distinction between an argument relating to the presentation of legally insufficient evidence and one pertaining to a violation of Crim.R. 31 is significant in this case, because Mallory did not object to the unanimity of his verdict or the contents of the court's jury instructions on the alternative means offenses. In the absence of a timely objection, our review is limited to plain error.

{¶ 67} To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule; (2) that is plain or obvious; and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "'Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Mallory*, 8th Dist. Cuyahoga No. 106052, 2018-Ohio-1846, ¶ 17, quoting *State v. Long*, 53 Ohio St.2d 91, 93, 372 N.E.2d 804 (1978), paragraph two of the syllabus. The "extremely high burden" of demonstrating plain error is on the defendant. *State v. Chapman*, 8th Dist. Cuyahoga No. 107375, 2019-Ohio-1452, ¶ 20.

{¶ 68} Although Mallory relies extensively on the holdings of *Gardner* and *Adams*, he has not asserted that the violation of Crim.R. 31 amounted to plain error. Under such circumstances, this court has no obligation to fashion a plain error argument on Mallory's behalf and then evaluate our own construction. *See, e.g., O'Donnell v. N.E. Ohio Neighborhood Health Servs.,* 8th Dist. Cuyahoga No. 108541, 2020-Ohio-1609, ¶ 87 ("We need not, sua sponte, consider a claim of plain error that the appellant has not argued on appeal."), citing *Katie L. v. Dennis M.,* 9th Dist. Medina No. 15CA0010-M, 2016-Ohio-338, ¶ 5 (noting that appellate court would not "engage in an analysis of plain error if an appellant fails to argue plain error on appeal"); *Coleman v. Coleman,* 9th Dist. Summit No. 27592, 2015-Ohio-2500, ¶ 9 (declining to sua sponte "fashion" a plain error argument "and then address it").

{¶ 69} Nevertheless, viewing the record in its entirety, we find no plain error. As previously stated, the jury in this case found Mallory not guilty of aggravated murder and felonious assault as charged in Counts 1 and 3 of the indictment. The jury was also unable to reach a decision of guilt or no guilt as to the murder and endangering children (abuse) offenses charged in Counts 2 and 4 of the indictment. Similar to the alternative means offense of domestic violence, the foregoing offenses each related to allegations that Mallory committed affirmative acts of abuse against the victim that resulted in physical harm or death. Given the implications of the jury's assessment of Counts 1-4 of the indictment, it logically follows that the jury found Mallory guilty of involuntary manslaughter based on the predicate offense of

endangering children, which required a finding of neglect rather than a finding of abuse. Given the overwhelming evidence supporting the predicate offense of involuntary manslaughter, we are unable to conclude that this is the exceptional case where notice of plain error is necessary to avoid a manifest miscarriage of justice.

{¶ 70} Based on the foregoing, we find sufficient evidence supports Mallory's involuntary manslaughter conviction. We further conclude that, despite the violation of Crim.R. 31, Mallory has failed to demonstrate plain error.

{¶ 71} Mallory's third assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 72} In his fourth assignment of error, Mallory argues his domestic violence, endangering children, and involuntary manslaughter convictions are against the manifest weight of the evidence.

{¶ 73} In reviewing a challenge to the manifest weight of the evidence supporting a conviction, a reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "When considering [a defendant's] claim that a conviction is against the manifest weight of the evidence, the court of appeals sits as a 'thirteenth juror' and may disagree with the factfinder's resolution of conflicting testimony." *Thompkins*, quoting *Tibbs v.*

*Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 74} Within this assigned error, Mallory broadly reiterates the sufficiency of the evidence arguments previously addressed, stating, in relevant part:

> With respect to child endangering, there was no proof that [Mallory] committed any specific act of omission necessary to show a failure to care for S.E. and no separate physical harm to upgrade that act to a felony if there had been an omission. With respect to domestic violence, there was no evidence that the prior assault predicate involved a family or household member. With respect to involuntary manslaughter, since neither predicate was sustained by proof, the conviction was against the manifest weight of the evidence.

{¶ 75} In the absence of a specific challenge to the credibility of the witnesses or the weight to be afforded to their testimony, we are unable to conclude that Mallory's convictions are against the manifest weight of the evidence. In this case, the circumstances surrounding S.E.'s death were exhaustively addressed at trial and the state presented ample evidence concerning Mallory's actions on the day of the incident, his role in S.E.'s injuries, the severity of S.E.'s internal and external injuries, and medical implications associated with the delay in S.E.'s emergency treatment. Defense counsel thoroughly cross-examined the state's witnesses concerning their opinions relating to the manner and cause of death, and the trier of fact was provided with all pertinent information concerning Mallory's contention that S.E. died as a result of a tragic accident. Viewing the record in its entirety, we find no basis to conclude that the trier of fact clearly lost its way and created such a

manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

{¶ 76} Mallory's fourth assignment of error is overruled.

### C. Ineffective Assistance of Counsel

{¶ 77} In his fifth assignment of error, Mallory argues defense counsel rendered ineffective assistance of counsel by failing to set forth specific arguments during his Crim.R. 29 motion for acquittal "as to child endangering (that the omission element necessary for conviction was not met), felony domestic violence (no proof of the predicate), and involuntary manslaughter (no proof of both predicates)." Reframed, Mallory contends that had defense counsel articulated the arguments posed in his first, second, and third assignments of error, he would not have been convicted of endangering children, felony domestic violence, or involuntary manslaughter.

{¶ 78} Our review of counsel's performance is highly deferential. *State v. Korecky*, 8th Dist. Cuyahoga No. 108328, 2020-Ohio-797, ¶ 20, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because we presume licensed attorneys are competent, the party claiming ineffective assistance of counsel bears the burden of proving that counsel was ineffective. *Id.*, citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985).

{¶ 79} "To gain reversal on a claim of ineffective assistance of counsel, a defendant must show that (1) his 'counsel's performance was deficient,' and (2) 'the deficient performance prejudiced the defense.'" *State v. Fisher*, 8th Dist. Cuyahoga

No. 108494, 2020-Ohio-670, ¶ 18, quoting *Strickland* at 687. "The first prong of *Strickland's* test requires the defendant to show 'that counsel's representation fell below an objective standard of reasonableness.'" *Id.*, quoting *Strickland* at 688. "*Strickland*'s second prong requires the defendant to show 'a reasonable probability that but for counsel's errors, the proceeding's result would have been different.'" *Id.*, quoting *State v. Winters*, 8th Dist. Cuyahoga No. 102871, 2016-Ohio-928, ¶ 25. That is, the second prong requires a determination as to whether the defense was prejudiced by counsel's ineffectiveness. *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, 108 N.E.3d 1028, ¶ 140, citing *Strickland* at 687.

{¶ 80} "While '[t]he right to counsel is the right to the effective assistance of counsel,' 'trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel.'" *Fisher* at ¶ 19, quoting *Strickland* at 686, citing *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

{¶ 81} In this case, defense counsel moved the court to dismiss all charges against Mallory at the conclusion of the state's case pursuant to Crim.R. 29. Counsel argued, in pertinent part:

> We would ask the court to grant that Rule 29 motion as to all the counts, and I will start out with the State obviously has not, despite calling numerous witnesses, some of them experts, been able to tell the fact-finders in this case exactly what caused the injury to [S.E.] that eventually led to her death.
>
> Clearly there is a lack of evidence of any sort showing exactly what happened. As a result, Your Honor, there is no way the jury can find beyond a reasonable doubt that any of the diverse theories that the state has set forth in its six-count indictment is provable beyond a reasonable

doubt, and we would argue at this point even viewing in the light most favorable to the state of Ohio there is insufficient evidence.

(Tr. 774.) Counsel then set forth detailed arguments concerning the inadequacy of the evidence supporting the aggravated murder charge. Counsel asserted that S.E.'s death was the result of a tragic accident and that there was "no direct or circumstantial evidence that Mr. Mallory had any specific intent to cause the death of [S.E.]." (Tr. 775.) Defense counsel subsequently renewed his request for an acquittal after the defense rested. (Tr. 778.)

{¶ 82} After careful consideration, we are unable to conclude that counsel was deficient for broadly attacking the state's theory concerning Mallory's role in the events leading to S.E.'s death. In this case, the predominant issue before the jury was whether S.E.'s injuries were sustained during an accidental fall or whether they were directly caused by Mallory. In this regard, defense counsel made the strategic decision to reiterate Mallory's position that S.E. died as a result of an unforeseen accident. Counsel further made the tactical decision to focus his specific arguments on the aggravated murder charge, which counsel maintained would prejudicially invoke the juror's sympathy if it were permitted to go before the jury. We decline to second-guess counsel's strategic decisions, which ultimately proved successful on a number of serious charges set forth in the indictment.

{¶ 83} Moreover, we find Mallory has failed to establish the requisite level of prejudice to support a finding of ineffective assistance of counsel. At the time the Crim.R. 29 motion was posed in this case, the domestic violence offense had yet to

be presented to the bench. Thus, it would have been premature to raise issues concerning the alleged deficiencies in the journal entry introduced in an effort to satisfy R.C. 2919.25(D)(3). Furthermore, consistent with our resolution of the second and third assignments of error, we find the state presented sufficient evidence to withstand a Crim.R. 29 motion on the endangering children and involuntary manslaughter offenses.

{¶ 84} Mallory's fifth assignment of error is overruled.

### D. Postrelease Control

{¶ 85} In his sixth assignment of error, Mallory argues the trial court erred when it improperly imposed a mandatory five-year period of postrelease control on his involuntary manslaughter conviction. Mallory contends that "[u]nder R.C. 2967.28(B)(2), the proper period of postrelease control is a term of a minimum of two years and a maximum of five years."

{¶ 86} Because a trial court has a statutory duty to provide notice of postrelease control at the sentencing hearing, any sentence imposed without proper notice of postrelease control is contrary to law. *State v. Grimes*, 151 Ohio St.3d 19, 2017-Ohio-2927, 85 N.E.3d 700, ¶ 8, citing *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 23 (both overruled on other grounds by *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248).

{¶ 87} A statutorily compliant imposition of postrelease control requires that the trial court advise the defendant of three things at the sentencing hearing and in the sentencing entry: "(1) whether postrelease control is discretionary or mandatory,

(2) the duration of the postrelease control period, and (3) a statement to the effect that the Adult Parole Authority will administer the postrelease control pursuant to R.C. 2967.28 and that any violation by the offender of the conditions of postrelease control will subject the offender to the consequences set forth in that statute." *Id.* at ¶ 1. "[A]ny error in the exercise of [the court's] jurisdiction in imposing postrelease control renders the court's judgment voidable, permitting the sentence to be set aside if the error [is] successfully challenged on direct appeal." *Harper* at ¶ 4.

{¶ 88} Relevant to this appeal, sections R.C. 2967.28(B) and (C) of the postrelease control statute were amended by 2021 H.B. 110, Section 101.01, effective September 30, 2021. Pursuant to the version of R.C. 2967.28(B)(2) in effect at the time of Mallory's sentencing hearing on November 19, 2021, a defendant convicted of a felony of the first degree that is not a felony sex offense is subject to a period of postrelease control of "up to five years, but not less than two years." Under the former version of the statute, however, a defendant convicted of a felony of the first degree or a felony sex offense was subject to a mandatory five-year period of postrelease control. *See* former R.C. 2967.28(B)(1).

{¶ 89} In this case, Mallory argues that the trial court erred by failing to afford him "the benefit of the reduced postrelease control sentence" on his first-degree felony conviction for involuntary manslaughter. In contrast, the state contends that Mallory "is subject to the original version of the statute" because "there is no provision in R.C. 2967.28(B)(2) making the amendments retroactive to acts occurring before the effective date."

{¶ 90} Whether the trial court erred in failing to apply the amended version of R.C. 2967.28(B) at the time of sentencing in this matter is a legal issue we review de novo. *State v. Pitts*, 2020-Ohio-5494, 163 N.E.3d 1169, ¶ 9 (1st Dist.), citing *State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.2d 1167, ¶ 8.

{¶ 91} It is well settled in Ohio that "when the General Assembly reenacts, amends, or repeals a criminal statute, the substantive provisions of the former law apply to all pending prosecutions, but the defendants receive the benefit of a reduced 'penalty, forfeiture, or punishment' in the statute as amended, unless the General Assembly expresses another intent." *State v. Solomon*, 2012-Ohio-5755, 983 N.E.2d 872, ¶ 16 (1st Dist.), citing R.C. 1.58, and *State v. Rush*, 83 Ohio St.3d 53, 697 N.E.2d 634 (1998). This principle arises from R.C. 1.58, which provides as follows:

> (A) The reenactment, amendment, or repeal of a statute does not, except as provided in division (B) of this section:
>
> > (1) Affect the prior operation of the statute or any action taken thereunder;
> >
> > (2) Affect any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, or incurred thereunder;
> >
> > (3) Affect any violation thereof or penalty, forfeiture, or punishment incurred in respect thereto, prior to the amendment or repeal;
> >
> > (4) Affect any investigation, proceeding, or remedy in respect of any such privilege, obligation, liability, penalty, forfeiture, or punishment, and the investigation, proceeding, or remedy may be instituted, continued, or enforced, and the penalty, forfeiture, or punishment imposed, as if the statute had not been repealed or amended.
>
> (B) If the penalty, forfeiture, or punishment for any offense is reduced by a reenactment or amendment of a statute, the penalty, forfeiture, or

punishment, if not already imposed, shall be imposed according to the statute as amended.

{¶ 92} Thus, "if a statute is amended and becomes effective while the defendant's case is pending in the trial court, then its applicability to the defendant's case is guided by R.C. 1.58." *State v. Stiltner*, 4th Dist. Scioto No. 19CA3882, 2021-Ohio-959, citing *State v. Kaplowitz*, 100 Ohio St.3d 205, 2003-Ohio-5602, 797 N.E.2d 977, ¶ 8.

{¶ 93} In accordance with the foregoing, the applicable inquiry in this case is whether the amendment reflected in R.C. 2967.28(B)(2) reduces "the penalty, forfeiture, or punishment" for Mallory's first-degree felony conviction. This requires that we ascertain the meaning of the terms "penalty, forfeiture, or punishment," which have not been defined by the General Assembly.

{¶ 94} As previously discussed, when interpreting a statute, we give plain and ordinary meaning to all the words and phrases in the statute and give effect to all parts of the statutory scheme. *See State v. Singer*, 50 Ohio St.2d 103, 108, 362 N.E.2d 1216 (1977); *United Tel. Co. of Ohio v. Limbach*, 71 Ohio St.3d 369, 372, 643 N.E.2d 1129 (1994). Generally, the term "penalty" means "the punishment inflicted by a law for its violation. The term is most applied to a pecuniary punishment.'" *In re Lange's Estate*, 164 Ohio St. 500, 505, 132 N.E.2d 96 (1956). Black's Law Dictionary indicates that the word, "penalty," is "[a]n elastic term with many different shades of meaning," but it typically "involves the idea of punishment, corporeal or pecuniary, or civil or criminal, although its meaning is generally

confined to pecuniary punishment." *Black's Law Dictionary* 1133 (6th Ed. 1990); *State v. Solomon*, 2012-Ohio-5755, 983 N.E.2d 872, ¶ 38 (1st Dist.). "Forfeiture" is "[a] comprehensive term which means a divestiture of specific property without compensation," and it includes the "[l]oss of some right or property as a penalty for some illegal act." *Black's* at 650; *Solomon* at ¶ 39; *State v. Whitaker*, 111 Ohio App.3d 608, 615, 676 N.E.2d 1189 (6th Dist.1996), quoting *Webster's Third New International Dictionary* (1986) 891, (defining "'[f]orfeiture' * * * as 'the loss of property or money on account of one's breach of [a] * * * legal obligation'"). Finally, the term "punishment" means "[a]ny fine, penalty, or confinement inflicted upon a person by the authority of the law and the judgment and sentence of a court, for some crime or offense committed by him * * *." *Black's* at 1234; *Solomon* at ¶ 40.

{¶ 95} After careful review of pertinent case law, we find the imposition of postrelease control constitutes a penalty, forfeiture, or punishment as contemplated under R.C. 1.58(B). As acknowledged by the Ohio Supreme Court in *State v. Bates*, 167 Ohio St.3d 197, 2022-Ohio-475, 190 N.E.3d 610:

> At its core, postrelease control is a sanction; it is an additional term of supervision after an offender's release from prison that imposes certain restrictions on the offender and, if violated, it allows the APA to impose conditions and consequences, including prison time, upon the offender. *See* R.C. 2967.01(N). Postrelease control is "aimed at behavior modification in the attempt to reintegrate the offender safely into the community." *Woods v. Telb*, 89 Ohio St.3d 504, 512, 733 N.E.2d 1103 (2000); *see also State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 16. In essence, postrelease control is a continued restraint on an offender's liberty after he or she serves the initial prison sentence. *See Watkins v. Collins*, 111 Ohio St.3d 425, 2006-Ohio-5082, 857 N.E.2d 78, ¶ 52; *see also Hernandez v. Kelly*, 108 Ohio St.3d 395, 2006-Ohio-126, 844 N.E.2d 301, ¶ 31, *superseded*

*by statute as stated in State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958.

*Id.* at ¶ 21; *see also State v. Martello*, 97 Ohio St.3d 398, 402 ("post-release control is part of the original judicially imposed sentence.").  Consequently, we believe that R.C. 1.58(B) applies and allows Mallory to seek the benefit of the amendment to R.C. 2967.28(B), which has reduced the duration of the postrelease control sanction applicable to a felony of the first degree that is not a felony sex offense.

{¶ 96} Based on the foregoing, we reverse the trial court's application of former R.C. 2967.28(B)(1), and vacate the designated term of postrelease control. *See State v. Gra*y, 8th Dist. Cuyahoga No. 110963, 2022-Ohio-939, ¶ 14 (finding the trial court erred by failing to apply the amendments to R.C. 2967.28 where the defendant was sentenced after the effective date of 2021 H.B. 110, Section 101.01.). Upon remand in this case, the trial court is required to include postrelease control as part of Mallory's sentence for the statutorily required period of "up to five years, but not less than two years" pursuant to R.C. 2967.28(B)(2), and the court must provide the required advisements and incorporate those advisements into the sentencing entry.

{¶ 97} Mallory's sixth assignment of error is sustained.

### D.  Reagan Tokes Law

{¶ 98} In his seventh assignment of error, Mallory argues the trial court erred in sentencing him under the Reagan Tokes Law, which became effective March 22, 2019.  He contends the Reagan Tokes Law is unconstitutional "insofar as it

violates the separation of powers clause by delegating sentencing to the executive branch of government and insofar as it violates the liberty interest of a defendant by failing to provide for meaningful protections against the violation of that interest."

{¶ 99} As acknowledged by Mallory on appeal, the question of whether the Reagan Tokes Law is constitutional was decided in this court's en banc opinion in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.). There, this court found "that the Reagan Tokes Law, as defined under R.C. 2901.011, is not unconstitutional," and reaffirmed the principles established in *State v. Gamble,* 2021-Ohio-1810, 173 N.E.3d 132 (8th Dist.); *State v. Simmons*, 2021-Ohio-939, 169 N.E.3d 728 (8th Dist.); and *State v. Wilburn*, 2021-Ohio-578, 168 N.E.3d 873 (8th Dist.). *See Delvallie* at ¶ 17. Because Mallory does not advance any novel argument left unaddressed by the *Delvallie* decision, we find the constitutional challenges presented in this appeal are overruled.[4]

{¶ 100} Mallory's seventh assignment of error is overruled.

### III. Conclusion

{¶ 101} Based on the foregoing, we affirm Mallory's convictions for endangering children (Counts 4 and 6), involuntary manslaughter (Count 5), and domestic violence (Count 7). However, because the furthermore specification attached to the domestic violence offense was not supported by sufficient evidence,

---

[4] Neither party has raised any issues as to the imposed sentence and, therefore, any determination as to the validity of the sentence is beyond the scope of this direct appeal. *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, 159 N.E.3d 248, ¶ 26; *State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, 162 N.E.3d 776, ¶ 27.

the domestic violence conviction must be modified to a misdemeanor of the first degree. On remand, the trial court shall resentence Mallory on the domestic violence offense to conform to the sentencing statutes governing misdemeanor offenses. In addition, we vacate the specified term of postrelease control imposed as part of Mallory's sentence and remand for a resentencing hearing limited to the proper imposition of postrelease control under R.C. 2967.28(B), as amended by 2021 Ohio H.B. 110, Section 101.01, effective September 30, 2021.

{¶ 102} Judgment affirmed in part, reversed in part, and remanded to the trial court for further proceedings.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EMANUELLA D. GROVES, J., CONCURS

N.B. Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.

Judge Emanuella D. Groves concurred with the opinions of Judge Lisa B. Forbes (dissenting) and Judge Anita Laster Mays (concurring in part and dissenting in part) in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.