[Cite as *State v. Danner*, 2023-Ohio-638.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220190 |
| | | TRIAL NO. C-21CRB-13980 |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| TIMOTHY DANNER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 3, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Judge.**

{¶1} After allegedly attacking his former partner, Cassandra Willoughby, the state charged defendant-appellant Timothy Danner with domestic violence in violation of R.C. 2919.25(A), and the trial court ultimately convicted him of that offense. He now appeals, suggesting that the state failed to demonstrate the requisite proof that Ms. Willoughby qualified as his family or household member for his conviction of domestic violence, and otherwise challenging the sufficiency and manifest weight of the evidence. Based on a review of the record before us, however, we agree with the trial court's decision and affirm its judgment.

I.

{¶2} The nature of Mr. Danner and Ms. Willoughby's relationship is integral to this case. During the four years when the two were in a relationship, the pair had resided together on two separate occasions: they shared an apartment for a year, and Mr. Danner lived with Ms. Willoughby in her father's house with her for a period of time as well. According to Ms. Willoughby's trial testimony, the two "were not back together" at the time of the incident, but on the day in question, she referred to him as her "boyfriend" and suggested that the pair were "trying to reconcile." Additionally, Mr. Danner had a strong affinity for her daughter (who is not his child)—Ms. Willoughby acknowledged that he "helps me the most with my child," and at trial, he described the relationship: "I love that little girl. Raised her, been a part of her life since before she came – literally before she came to earth."

{¶3} The catalyst for the assault was apparently a broken center console in Ms. Willoughby's vehicle. According to her testimony, she discovered the day before the attack that the center console of her car was broken, which she suspected occurred

when Mr. Danner used her car without her permission. Further inspection revealed that the console likely broke due to a person climbing from the front seat to the back (or vice versa), meaning that he must have had someone else in the car with him. Frustrated by this discovery, she confronted him the next day about his impermissible joyriding in her car.

{¶4} Insulted by the accusations levied by Ms. Willoughby (because they were tantamount to an allegation of infidelity), Mr. Danner stormed down to the basement of her house, where many of his personal effects were. Following close behind, she inquired if he was headed to the store, to which he responded that if he left the house, he would never return. Not taking the bait, Ms. Willoughby assured him that he was free to leave. At this point, the stories of both individuals quickly diverge.

{¶5} According to Ms. Willoughby, as Mr. Danner began collecting his things, he grew more irate by the minute, saying "terrible things" to her. She began helping him gather his belongings when he took a swing at her—apparently to scare her, but not to actually hit her. Further bickering between the two only fueled Mr. Danner's anger, prompting him to grab her by the throat and force her to the ground. The choking exacerbated pain from a recently-completed tonsillitis (known by Mr. Danner). As Ms. Willoughby sought to resist and reminded him of the pain he was inflicting, he told her that he hoped that she would never sing again. Eventually, Mr. Danner released his grip, collected his things, and stopped by the daughter's room to bid farewell. Ms. Willoughby called the police to report the assault, but the two reporting officers arrived after Mr. Danner departed.

{¶6} Upon hearing Ms. Willoughby's account, the officers requested that she write and sign an affidavit in order to press charges against Mr. Danner—as she had informed the officers, her primary concern was keeping him away from her. Both officers noticed a red mark on her neck and took photos that the state would later submit into evidence.

{¶7} Mr. Danner tells a different version of the day in question. According to him, he had standing permission to use Ms. Willoughby's car, and had simply driven it briefly the night before. He also insists that she had broken the center console a few days earlier. When Ms. Willoughby questioned Mr. Danner about his use of her car with a third person, he felt insulted, believing that she insinuated infidelity.

{¶8} After Ms. Willoughby told him that he could leave while in the basement of her house, he recalls her standing in front of the basement stairs blocking his path. As he went to grab his favorite blanket—an action that he believed caused her to realize the gravity of the situation—she lunged at him, with his hands full of his belongings, scratching and bruising him, and yelling that she just had recently undergone a tonsillitis procedure.

{¶9} Mr. Danner then dropped his things and put his hands out in a defensive manner, causing his weight to shift to the ground. This motion caused him to end up toppling on to Ms. Willoughby, but with hands only on her shoulders. She continued to shout about her operation, and he responded, "I don't care that you sing again." When she began hurling insults, he went to say goodbye to her daughter, and he thereafter left the house. Mr. Danner maintains that he never grabbed Ms. Willoughby by the throat at any point.

**{¶10}** At trial, after the state presented its case, Mr. Danner's counsel moved for a judgment of acquittal, believing that the state insufficiently demonstrated the family member requirement for a domestic violence conviction. After the denial of this motion, and after his testimony, the trial court found Mr. Danner guilty of domestic violence. The court sentenced Mr. Danner to a 180-day jail term, with 166 days suspended and 14 days credited for time served. Further, the court placed him on community control for 18 months, required him to complete anger management, ordered him not contact Ms. Willoughby, and assessed a $100 fine. On appeal, Mr. Danner presents two assignments of error.

II.

**{¶11}** Mr. Danner first challenges the trial court's denial of his motion for a judgment of acquittal. *See* Crim.R. 29(A) ("Motion for judgment of acquittal. The court on motion of a defendant * * * after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."). And "[t]he standard of review for the denial of a Crim.R.29(A) motion is the same standard for a challenge to the sufficiency of the evidence." *State v. Pope*, 1st Dist. Hamilton No. C-180587, 2019-Ohio-3599, ¶ 3, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

**{¶12}** "To determine whether a conviction is supported by sufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574

5

N.E.2d 492 (1991), paragraph two of the syllabus. And " '[w]here reasonable minds can reach different conclusions upon conflicting evidence, determination as to what occurred is a question for the trier of fact. It is not the function of an appellate court to substitute its judgment for that of the factfinder.' " *State v. Shabazz*, 146 Ohio St.3d 404, 2016-Ohio-1055, 57 N.E.3d 1119, ¶ 20, quoting *Jenks* at 279. Whether the evidence sufficed to support the conviction presents a legal question that we review de novo. *State v. Ellison*, 178 Ohio App.3d 734, 2008-Ohio-5282, 900 N.E.2d 228, ¶ 9 (1st Dist.).

{**¶13**} Mr. Danner focuses on whether the evidence established that Ms. Willoughby was a family or household member—a requirement for a conviction of domestic violence. *See* R.C. 2919.25(A) ("No personal shall knowingly cause or attempt to cause physical harm to a family or household member."). Because the couple is unmarried, for Ms. Willoughby to qualify, she must be a "person living as a spouse" under the statute. R.C. 2919.25(F)(1)(a)(iii) (" 'Family or household member' means any of the following: * * * a person living as a spouse."). In turn, a "person living as a spouse" means, "a person who is living or has lived with the offender in a common law martial relationship, who otherwise is cohabitating with the offender, or who otherwise has cohabitated with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2).

{**¶14**} "Cohabitation" under R.C. 2919.25(F)(2) is not defined by statute, but Ohio common law largely elucidates the term. While the state can demonstrate cohabitation by showing (1) the sharing of familial or financial responsibilities, and (2) consortium, *State v. Williams*, 79 Ohio St.3d 459, 683, N.E.2d 1126 (1997), "where the offender and victim do share the same residence while in a relationship, the state is

6

not required to demonstrate the sharing of familial or financial responsibilities and consortium." (Emphasis omitted.) *State v. Curry*, 1st Dist. Hamilton No. C-190107, 2020-Ohio-1230, ¶ 15, citing *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15. "Therefore, under *McGlothan*, 'cohabitation' also includes situations where the victim and the offender 'lived together and were in a relationship from which the domestic violence arose.' " *Id.*, quoting *McGlothan* at ¶ 17.

{¶15} Acknowledging this statutory landscape, Mr. Danner believes that the state's evidence fell short of establishing that the two lived together and were in a relationship at the time of the incident. He highlights various factors: Ms. Willoughby testified that the pair were not together at the time of the incident, that he was merely "staying with her" for a short period of time and not living with her, and that he had stowed all of his belongings in the basement as further proof of a temporary—rather than long-term—visit. But Mr. Danner's narrow interpretation of this concept runs afoul of how the Supreme Court instructs us to apply the statute.

{¶16} "[B]y determining that the offense of domestic violence 'arises out of the relationship of the parties rather than their exact living circumstances,' we interpret[] [R.C. 2919.25] broadly to include those who do not live with the offender but who also deserved protection under the statute based on their relationship with the offender." *McGlothan* at ¶ 14, quoting *Williams* at 464. And similar to the facts at hand, this court has previously found instances of "cohabitation" based on some period of dating combined with a period of living together. *See Curry* at ¶ 16 (finding sufficient evidence of cohabitation where defendant and victim were "in a relationship" at the time of the incident and had shared a residence for a few months); *State v. Schwegmann*, 1st Dist. Hamilton No. C-180053, 2018-Ohio-3757, ¶ 18-19 (finding

7

sufficient evidence of cohabitation where defendant and victim had dated for six months and lived together for a month prior to the domestic violence).

{¶17} Here, even if the more recent cohabitation were insufficiently short for statutory purposes (and we take no position on that question), the state established that Mr. Danner and Ms. Willoughby lived together in the past—sharing an apartment together for a year, and then the pair lived together for a period in Ms. Willoughby's father's house. This proof, construed in a light most favorable to the state, at a minimum established cohabitating "within five years prior to the date of the alleged commission of the act in question." *See* R.C. 2919.15F(2). Based on this record evidence, the trial court reasonably found that the two cohabitated for the purposes of Mr. Danner's conviction. We accordingly overrule his first assignment of error.

III.

{¶18} Next, in his second assignment of error, Mr. Danner challenges his conviction on manifest weight of evidence grounds—in this respect, he attacks Ms. Willoughby's credibility as it relates to the incident and their evolving relationship.

{¶19} In reviewing whether the conviction runs counter to the manifest weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In other words, we review the evidence, the credibility of the witnesses, and the entire record. *Id.* But we will only reverse if the trial court " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶20} And "it is well settled law that matters as to the credibility of witnesses are for the trier of fact to resolve." *State v. Ham*, 1st Dist. Hamilton No. C-170043,

8

2017-Ohio-9189, ¶ 21. " 'When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.' " *State v. Robinson*, 12th Dist. Butler No. CA2018-08-163, 2019-Ohio-3144, ¶ 29, quoting *State v. Lunsford*, 12th Dist. Brown No. CA2010-10-021, 2011-Ohio-6529, ¶ 17.

{¶21} Notwithstanding the photos offered into evidence showing a red mark on Ms. Willoughby's neck, Mr. Danner posits that her fair complexion reddens when she becomes angry or upset, and he believes that is the more credible explanation as opposed to any choking scenario. Moreover, he suggests that his version of events is a more plausible account of what happened.

{¶22} But our guiding standard explains that when two competing narratives of an event are presented at trial, the trial court believing the prosecution's theory over the defendant's does not, by itself, render the conviction against the manifest weight of the evidence. *See Id.* at ¶ 29. And here, the trial court, after evaluating all the evidence and testimony before it, found Ms. Willoughby's narrative of the incident to be credible. We see nothing in the record to undermine the trial court's credibility determination here.

{¶23} Mr. Danner next reframes the relationship status that he broached in his first assignment of error as a manifest weight issue. While both parties offer varying accounts as to the nature of their relationship, a "review [of] the evidence, the credibility of witnesses, [and] the entire record," *see Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, all convinces us that, for the purposes of R.C. 2919.25, the pair were cohabitating consistent with the analysis above. Underscoring the point, Mr. Danner

does not dispute that the two had cohabitated "within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25F(2).

\* \* \*

{¶24}  In light of the foregoing analysis, we overrule both of Mr. Danner's assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.