[Cite as *State v. Kelley*, 2023-Ohio-3972.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff- Appellee, | : | No. 112162 |
| v. | : | |
| KEVIN KELLEY, | : | |
| Defendant-Appellant. | : | |

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 2, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-663985-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Owen Knapp, Assistant Prosecuting Attorney, *for appellee.*

Robert A. Dixon, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant Kevin Kelley appeals from a judgment of the trial court convicting him of third-degree felony domestic violence and abduction after a bench trial. On appeal, he challenges the trial court's exclusion of two alibi witnesses

who violated the trial court's order of separation of witnesses. We agree with the state that the court's exclusion of one of the witnesses was proper because the record indicates Kelley called him after the first day of trial and informed him of the victim's testimony. While the record is void of any evidence the defense was involved with the other witness's violation of the separation order when the witness was discovered in the courtroom during the state's expert's testimony, we are unable to determine the exclusion materially prejudiced Kelley in this case because a proffer of the witness's anticipated testimony was never provided for review and the witness could not provide any alibi information when interviewed during the investigation.

{¶ 2} Kelley also claims there is insufficient evidence for the elevation of his domestic violence to a third-degree felony based on his prior assault convictions. While the journal entries for the prior assault convictions did not specify that the victim in those cases was a family or household member, our review of the transcript reflects testimony that the victim T.M. in the instant case was also the victim in these prior assault cases and she and Kelley had lived together and were in a relationship since 2017 and, therefore, was "a family or household member" as statutorily defined. Having thoroughly reviewed the record and applicable law, we affirm the trial court's judgment.

**Procedural Background**

{¶ 3} Kelley was charged with aggravated burglary, burglary, abduction, and domestic violence with a furthermore specification of two prior assault convictions involving a family or household member. The instant charges stemmed

from an incident on November 13, 2020, where, as his girlfriend T.M. alleged, he assaulted her at her apartment in Parma Heights after they were out drinking at several bars. Kelley claimed that after visiting the bars, he returned to his residence and was never at T.M.'s residence that night. He claimed that T.M. fabricated the assault incident. The case proceeded to a bench trial after Kelley waived a jury trial.

{¶ 4} The defense filed a notice of alibi several days before the trial, providing notification that three witnesses, Charlie Smith, Tim Waters, and Glen Wilson, would provide alibi evidence at trial. Smith and Waters were employees at the recovery house in Lorain where Kelley stayed around the time of the incident; Wilson was a resident there. The notice of alibi provided only the names of the proposed alibi witnesses without stating what these witnesses would be testifying to. Before the trial commenced, the state moved for separation of witnesses pursuant to Evid.R. 615. The trial court granted the motion regarding the alibi witnesses but allowed the defense's investigator Christopher Giannini to remain in the courtroom. Subsequently, the defense did not offer Smith as a witness at trial and the trial court excluded Waters and Wilson from testifying because they violated its order of separation of witnesses — a matter which we discuss in detail under the first assignment of error.

**Trial Testimony**

{¶ 5} Although on appeal Kelley only challenges the exclusion of the alibi witnesses and the elevation of his domestic violence offense to a third-degree felony

based on his prior convictions, the trial testimony is described in its entirety in the following to provide a context for Kelley's claims.

{¶ 6} The following individuals testified for the state: (1) the victim T.M., (2) the manager of one of the bars T.M. and Kelley visited that night, (3) a cellphone data analyzer who testified about his tracing of Kelley's location that night based on the data from Kelley's cellphone, (4) T.M.'s ex-husband, who made a 911 call when Kelley showed up at T.M.,'s door several days after the incident, (5) the police officer who responded to the 911 call, and (6) several police officers involved in the investigation of this matter.

{¶ 7} T.M. testified that she was involved in a romantic relationship with Kelley since January 2017. The relationship was strained around the time of the incident. On November 13, 2020, they met after work at Cleats Club and Grill, a bar they had frequented. Each arrived in their own car. After a short time there, they went to Dale's, a sports bar in Lorain, in T.M.'s vehicle. While at Dale's, Kelley was agitated and they argued. Kelley went to another bar across the street, Crystal Rock, while T.M. remained at Dale's. When Kelley was ready to leave, he came back to T.M. and grabbed her car keys and said, "Let's go, we're going." She agreed to return to Cleats so that Kelley could retrieve his own vehicle. On the way to Cleats, Kelley drove to a pizza parlor, Yala's, and purchased a pizza. While at Yala's, both of them became very upset with each other and T.M. told him not to come back to her apartment. In response, Kelley smacked the side of her face.

{¶ 8} When they returned to Cleats, Kelley placed the pizza box and his cellphone on the hood of T.M.'s vehicle. Both of them apparently forgot these items were still there when they left. T.M. testified she drove away in such a hurry that the pizza box flew off the hood. Also, because of her emotional state, she got confused when she was driving home; she took I-90 instead of I-480, which took her longer to get home.

{¶ 9} When she opened the door of her apartment, to her surprise, Kelley was sitting at a chair in her kitchen. He slammed the door and started yelling at her, wanting to know where she had been. She wanted to leave, but he grabbed her wrists and tried to take her car keys and cellphone, saying to her "you're not leaving." He shoved her against the wall several times, with his hands on her wrists and shoulders. He also put his feet on her feet and eventually took her car keys and cellphone. Realizing she could not leave without her keys and cellphone, she lay down on the couch while he went to sleep in the bedroom. She waited for a while and then tried to retrieve her cellphone from the bedroom, which woke him up and he shoved her against the wall. She was exhausted and afraid of getting hurt if she tried to leave and awaken Kelley again. She eventually fell asleep on the couch. The transcript reflects the following testimony:

> [T.M.]: [I]f I fought him too much, what is going to happen next? If he heard me go out the door. He heard me out in Lorain. My battery was disabled.
>
> [Prosecutor]: Are you referencing a prior occasion?

[T.M.]: Yes. You are fearful of being hurt trying to get out the door. Where am I going to go?

[Prosecutor]: Have you tried to leave Kevin under similar circumstances in the past?

[T.M.]: In Parma and Lorain. Yes, I have.

{¶ 10} T.M. went on to describe those two prior incidents where Kelley assaulted her when she tried to leave. In the Parma incident, he held her head and threw her around the apartment; in the Lorain incident, he pushed her against the wall and held a knife in his hand.

{¶ 11} T.M. testified that Kelley lost his phone sometime during the night in question. When they woke up next morning, he asked her to call Cleats to inquire about the lost phone and then had her accompany him to return to Cleats to look for it. He purchased a replacement phone soon after, and they returned to her apartment around 3 p.m. He set up his new phone in her apartment and spent the night there.

{¶ 12} Another incident occurred several days later on November 17, 2020. On that day, T.M. received a text from Kelley indicating he was coming to her apartment. She told him not to come over. Her ex-husband David Lanum happened to call her around that time, and she told him about Kelley. Knowing Kelley was on his way to her apartment, T.M. locked her door. Kelley arrived and was highly intoxicated. She put her hand on the door bolt while he tried to get inside. Lanum was by now also outside her apartment, and he called 911.

{¶ 13} Officer Ronald Felkonis of Parma Heights police department responded to the 911 call. He testified that Kelley was intoxicated and was advised not to have further contact with T.M. Lanum also testified and confirmed T.M.'s testimony about this incident.

{¶ 14} Theresa Schmidt, the manager of Cleats Club & Grill, also corroborated T.M.'s testimony. She testified she knew Kelley as a customer. On the night in question, Kelley and T.M. had a couple of cocktails but did not stay a long time at the bar. She recalled getting a phone call later inquiring about a lost phone.

{¶ 15} The next day after the November 17, 2020 incident, T.M. decided to go to Parma Heights police department to file a police report about the incident on November 13, 2020, a decision she described as "heartbreaking." Patrolman Christopher Rossman made a report based on T.M.'s account of the events. He testified that he observed bruises on her feet, shoulder, and forearm, which matched her account. He took photographs of the bruises, and T.M. also provided her own photographs of the bruises.

{¶ 16} T.M. testified that Kelley subsequently asked her not to cooperate with law enforcement and they discussed how to explain the bruises on her feet. She was ambivalent about whether she should have reported the incident because Kelley threatened to take his own life. The state introduced several jail calls from Kelley to T.M. in which they discussed the case. The state also introduced text messages created by them together that tried to convey a false account of the events; in one of them, she stated her feet were injured from kickboxing.

{¶ 17} T.M. was cross-examined as to certain inconsistent details in her statements to Patrolman Rossman and Detective Adam Sloan, who also interviewed her regarding the incident. The account she gave to Detective Sloan was consistent with her testimony at trial.

{¶ 18} T.M.'s account of the events is also consistent with the location analysis performed by Seth Dodson, an analyst for Ohio State Highway Patrol with five years of experience in analyzing cellphone data. He testified Kelley's device was located in Cleats Bar & Grill around 4:15 p.m., in Dale's around 6:50 p.m., and in Yala's Pizzeria around 8:15 p.m. The device then appeared to be traveling on I-90, but its movement terminated around 9:45 p.m. on I-90. Another device belonging to Kelley was located the next day around 2:45 p.m. at T.M.'s address. On cross-examination, Dodson acknowledged Kelley's device was never located at T.M.'s address on the night of November 13, 2020.

{¶ 19} Detective Sloan also testified and acknowledged that T.M. had given him information inconsistent with the information she provided in her initial police report; for example, in the initial police report, she stated that she drove Kelley to her apartment. Detective Sloan interviewed Kelley as well, and Kelley denied being at T.M.'s resident, or being with her at all, on November 13, 2020. Kelley stated that he went to Cleats and Yala's but did not go to T.M.'s residence afterwards, and he offered his Google account information from his cellphone to prove his locations during that evening. Kelley also provided Detective Sloan the names of three individuals, Charles Smith and Tim Waters, who worked at the recovery house

where Kelley was staying at the time, and Glen Wilson, a resident there. When interviewed, Wilson did not tell Detective Sloan where Kelley was that night but only referred the detective to the other two individuals, Smith and Waters, for information. Smith told Detective Sloan he did not know Kelley's whereabouts that night but indicated there might be records regarding his whereabouts. Detective Sloan also interviewed Waters, but he provided no pertinent information either.

{¶ 20} The transcript reflects that before the state's last witness (Detective Sloan) testified, the prosecutor reported to the court that it had come to the state's attention that the court's separation order was violated by Kelley's alibi witnesses. Kelley called Waters from the jail the night before — the night of the first day of trial — and told him about what occurred during the trial, and Wilson sat in the back of the courtroom during Seth Dodson's testimony. The state moved for contempt and requested their exclusion.

{¶ 21} After the state rested its case, it renewed its request for the exclusion of those two witnesses. The state played the jail call from Kelley to Waters. In the phone call, Kelley accused T.M. of being a liar on the witness stand and also appeared to tell Waters that his testimony the next day would be about him (Kelley) returning to the recovery house on the 13th.

{¶ 22} The state also asked the trial court to exclude Wilson on the ground that Wilson was found sitting in the back of the courtroom before his presence was required. The state alleged that Wilson was "spying" on the testimony of Seth Dodson, who testified regarding the locations of Kelley's cellphones throughout the

evening in question. The defense counsel acknowledged that Wilson heard Dodson's testimony but expressed his doubt for Wilson's ability to "pull any information out of that[.]"  Without any further inquiry, the trial court granted the state's request and excluded these two witnesses from testifying.[1]

{¶ 23} The defense counsel alleged in the opening argument that Kelley returned to the recovery house after he and T.M. visited the bars and, when he realized he had lost his cellphone, he borrowed someone's phone and called T.M. to see if his phone was in her vehicle.  Kelley, however, did not testify.  Rather, the defense offered the testimony of Sean Burnett, his probation officer in the Lorain County felonious assault case; Christina Kamnan, his probation officer in Erie

---

[1] Page 358 of the transcript reflects that the defense counsel did not make a proffer of the expected testimony of the alibi witnesses after the court excluded the alibi witnesses:

> [TRIAL COURT]: * * * Whoever the gentleman was on that [jail] call is not testifying in this case.  Whoever the gentleman was that violated this Court order that was sitting in the back of the courtroom as an alibi witness is not testifying in this case.
>
> [DEFENSE COUNSEL]: I'm sorry, I didn't hear.
>
> [TRIAL COURT]: They are not testifying.
>
> [DEFENSE COUNSEL]: Okay. They are both out?
>
> [TRIAL COURT]: Both are out.
>
> [DEFENSE COUNSEL]: For the record, I object, your honor.
>
> [TRIAL COURT]: Your objection is noted.

County for an unrelated case; and Christopher Giannini, a computer and cellphone data analyst.

{¶ 24} Neither probation officers testified to the events on November 13, 2020, or provided any favorable testimony for the defense. Rather, upon cross-examination, Burnett confirmed that T.M. was the victim in the Lorain County assault case (tr. 386) and there was a no-contact order issued by the Lorain court at a violation hearing (tr. 396).

{¶ 25} Christopher Giannini, a computer and cellphone data analyst, testified that Kelley's cellphone was at Cleats until 6:00 p.m. It was then located at East 28th Street at the corner of Route 57, and then at Yala's, before returning to Cleats. It disappeared from the tracking map around 9:45 p.m. Giannini testified his analysis showed Kelley's cellphone was never at T.M.'s residence — which is the same conclusion drawn by the state's cellphone data analyst. Giannini testified that the police should have obtained data regarding the inbound and outbound calls and text messages in Kelley's cellphone, which could have corroborated the witnesses' versions of the events.

{¶ 26} In closing argument, the defense alleged T.M. fabricated her account of Kelley assaulting her at her residence. The defense stressed that the phone location data did not place Kelley at her residence and that T.M.'s varying accounts of the events to the police showed that she was not a credible witness.

**Verdict and Appeal**

{¶ 27} The trial court found Kelley not guilty of aggravated burglary or burglary, but guilty of abduction and a third-degree domestic violence offense. The court imposed a 36-month prison term each for his domestic violence and abduction offenses, to be served concurrently.

{¶ 28} While Kelley attacked the credibility of T.M. at trial, on appeal, he raises the following two assignments of error for our review:

> I. The lower court erred and violated the appellant's rights to present a defense and to a fair trial, pursuant to the Sixth and Fourteenth Amendments to the United States Constitution when it excluded a defense alibi.

> II. The verdict and judgment finding the appellant guilty of a third-degree domestic violence was based upon legally insufficient evidence and violated due process of law.

**Exclusion of Alibi Witness**

{¶ 29} Under the first assignment of error, Kelley argues that his conviction should be reversed because the trial court improperly excluded two alibi witnesses, Waters and Wilson.

{¶ 30} In this case, the trial court ordered a separation of witnesses pursuant to Evid.R. 615, which governs separation and exclusion of witnesses. The rule states that "at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion." "The purpose of separating witnesses is to prevent them from hearing the testimony of other witnesses and tailoring their testimony accordingly." *State v.*

*Stroud*, 11th Dist. Ashtabula Nos. 2022-A-0032, 2022-A-0033, and 2022-A-0034, 2023-Ohio-569, ¶ 41, citing *State v. Waddy*, 63 Ohio St.3d 424, 434, 588 N.E.2d 819 (1992).

{¶ 31} "Exclusion of witnesses is * * * a decision within the sound discretion of the trial court." *State v. Smith*, 49 Ohio St.3d 137, 142, 551 N.E.2d 190 (1990).

> However, where the court seeks to exclude a witness for violating a separation order, there must be a showing that the party calling the witness consented to, connived in, procured or had knowledge of the witness' disobedience. Secondly, the testimony sought to be introduced must be important to the defense such that exclusion of the evidence constitutes prejudicial error.

*Id.  See also, e.g.*, *State v. Cottrell*, 8th Dist. Cuyahoga No. 81356, 2003-Ohio-5806, ¶ 39; *State v. Kingsley*, 5th Dist. Stark No. 2009CA00113, 2010-Ohio-1187, ¶ 24. Pursuant to *Smith*, in order to conclude that a trial court's exclusion of a disobedient witness was proper, "a reviewing court must either find that the defense encouraged or knew of the witness's violation, and if the defense did not, then it must find that the witness's exclusion caused no prejudice to the defendant." *State v. DeWitt*, 7th Dist. Mahoning No. 09 MA 68, 2010-Ohio-4777, ¶ 62.  Furthermore, the court has held that the preferred sanction for a separation order violation "'is simply to allow the transgression to reflect upon the witness's credibility.'" *Id.* at ¶ 63, quoting S*tate v. Hohvart*, 7th Dist. Mahoning No. 06 MA 43, 2007-Ohio-5349, ¶ 31.

{¶ 32} In this case, the trial court excluded two alibi witnesses, Waters and Wilson, from testimony due to their violation of the separation of witnesses ordered by the court.[2]

{¶ 33} Waters was an employee of the recovery house. When interviewed by Detective Sloan, he provided no pertinent information to the detective. On the second day of the trial, the state introduced the audiotape of a jail call placed by Kelley to Waters in the evening of the first day of the trial. Kelley was heard talking about T.M.'s testimony, accusing her of lying on the witness stand, and he appeared to tell Waters that his testimony the next day would be about him "coming home" on the 13th. As such, the record demonstrates that Kelley was directly involved in the witness's violation of the separation order and, therefore, we do not consider whether the exclusion caused prejudice to the defendant. The trial court did not abuse its direction in excluding Waters from providing alibi testimony pursuant to *Smith*.

{¶ 34} We, however, find the exclusion of Wilson concerning. He was a resident at the recovery house and was found to be sitting at the courtroom while Seth Dodson, the Ohio State Highway Patrol analyst, was testifying about his location tracking analysis. While Wilson violated the separation order, our review

---

[2] While the notice of alibi also identified Charles Smith as an alibi witness, the defense did not call Smith as a witness — or produce the records from the recovery house — after the trial court excluded Waters and Wilson.

of the transcript does not clearly indicate that Kelley or his counsel "consented to, connived in, procured or had knowledge of the witness's disobedience."

{¶ 35} The trial court here, however, excluded Wilson from testifying without inquiring as to what his testimony would be. We note that Kelley's defense to the state's allegation was that he was not present in the victim's apartment at the time of the alleged incident. Therefore, the alibi witnesses could be important to his defense. As the case law indicates, the remedy for a violation of the separation order would be "to allow the witness to be cross-examined on such violation so that it may go to the trier of facts as bearing on his credibility." *State v. Wilson*, 5th Dist. Stark No. 2016CA00071, 2016-Ohio-5895, ¶ 38. The trial court should have permitted Wilson to testify and allow the violation to reflect on his credibility or, at a minimum, fully considered the matter before excluding him from testifying. Therefore, we have concerns about the trial court's summary exclusion of Wilson.

{¶ 36} However, the Supreme Court of Ohio has cautioned that a reviewing court should be slow to interfere and should not reverse a trial court's ruling admitting or excluding evidence unless the trial court has abused its discretion and the defendant has been materially prejudiced. *State v. Maurer*, 15 Ohio St. 3d 239, 265, 473N.E.768 (1984). In the context of excluding a witness for a violation of a separation order, we must find whether the witness's exclusion prejudiced the defendant. *Smith,* 49 Ohio St.3d at 142, 551 N.E.2d 190; *State v. Nichols*, 4th Dist. Adams No. 11CA912, 2012-Ohio-1608, ¶ 44-45 (when the trial court erred in not allowing the witness to testify because there was no evidence that the defendant or

counsel connived in or procured the witness's violation, the appellate court must decide whether the trial court's exclusion constituted prejudicial error).

{¶ 37} When interviewed by Detective Sloan, Wilson did not tell the detective when or where he saw Kelley on the night of the incident, but only referred the detective to the recovery house's staff Smith and Waters for information for Kelley's whereabouts. Furthermore, Kelley's notice of alibi only identified three individuals as alibi witnesses without including "specific information as to the place at which the defendant claims to have been at the time of the alleged offense" as required by Crim.R. 12.1.

{¶ 38} More importantly, there was no proffer by Kelley as to what Wilson would have testified. "[W]ithout a proffer of the expected testimony of the excluded witness, we are unable to determine whether the trial court abused its discretion in excluding that testimony and whether such exclusion prejudiced appellant." *State v. Nicholas*, 5th Dist. Muskingum No. CA 92-29, 1993 Ohio App. LEXIS 3035, 2 (June 1, 1993), citing *State v. Chapin*, 67 Ohio St.2d 437, 444, 424 N.E. 2d 317 (1981) (The Supreme Court of Ohio affirmed "the long-standing rule that a reviewing court will uphold the trial court's decision to exclude evidence if the record does not contain a proffer."). When there is no proffer made to the trial court concerning what the witness's testimony would have been, we are unable to engage in a meaningful prejudice review. *State v. Hopkins*, 6th Dist. Erie No. E-10-027, 2011-Ohio-5908, ¶ 57 (where there was no proffer about the content of potential testimony, we must adhere to the rule set forth in *Chapin*). While an alibi witness is expected to testify

that Kelley was not present at the scene of the crime, in this case it was crucial for Wilson to be able to offer specific information about *when* and *where* he saw Kelley, given the lack of any information in the notice of alibi and Wilson's inability to provide any information to the police when interviewed. "Absent a proffer, the substance of the alleged alibi witness's proposed testimony is a matter of sheer speculation." *State v. Burns*, 5th Dist. Richland No. 10CA130, 2011-Ohio-5926, ¶ 48. *See also John T. Shear Corp. v. Shiros, Inc.*, 8th Dist. Cuyahoga No. 49559, 1985 Ohio App. LEXIS 7322, 8 (Oct. 3, 1985) ("Without a proffer, this court cannot determine whether [the] exclusion was prejudicial."). Without knowing the specifics of Wilson's alibi testimony, we are unable to say that his exclusion materially prejudiced Kelley.

{¶ 39} We additionally observe that the trial court here, as the trier of fact, was tasked with the assessment of the alibi witness's credibility. The transcript reflects that the defense counsel acknowledged that Wilson heard the testimony of the state's cellphone data analyst, who testified about the time line of Kelley's locations throughout the evening. When the trial court excluded the alibi witnesses, it specifically stated that "even if [the witnesses] did testify, their credibility will be assessed by the trier of fact and that credibility has been tarnished." Because the trier of fact has expressly found the alibi witnesses' credibility to have been significantly affected by their violation of the separation order, we cannot conclude the exclusion of Wilson was prejudicial. Having reviewed the record and applied the pertinent case law, we find the first assignment of error not well taken.

**Prior Convictions: Element of Third-Degree Felony Domestic Violence**

{¶ 40} Under the second assignment of error, Kelley contends that there is insufficient evidence supporting his third-degree domestic violence offense.

{¶ 41} When reviewing a challenge to the sufficiency of the evidence, we review the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 42} In Count 4 of the indictment, Kelley was charged with domestic violence in violation of R.C. 2919.25(A) with a furthermore specification that he had been convicted of prior assault offenses involving a family or household member.

{¶ 43} R.C. 2919.25(A) states, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." The offense is elevated to a fourth-degree felony if a defendant was previously convicted of a domestic violence *or* "any offense of violence if the victim of the offense was a family or household member" at the time of the commission of the offense. R.C. 2919.25(D)(3). And, the offense is elevated to a third-degree felony if a

defendant was previously convicted of two or more such offenses. R.C. 2919.25(D)(4). When a prior conviction elevates a misdemeanor to a felony, the prior conviction is an essential element of the crime and must be proven by the state. *State v. Tate*, 138 Ohio St.3d 139, 2014-Ohio-44, 4 N.E.3d 1016, ¶ 17.

{¶ 44} It is undisputed that Kelley was convicted of felonious assault in Lorain C.P. No. 18-CR-099452 on March 29, 2019, and of assault in Parma M.C. No. 18-CR-B02880 on August 4, 2020, for an incident that occurred on July 4, 2018.[3] During the trial, the state introduced the journal entries relating to these convictions. The journal entries, however, do not reveal the identity of the victim or specify that the victim was a family or household member.

{¶ 45} Because both prior offenses are offenses of violence, the only issue here is whether the state produced sufficient evidence to prove the victim involved in these offenses was a family or household member. Kelley argues on appeal that the state failed to present any evidence to support the allegation that the victim in these offenses was a family or household member.[4]

{¶ 46} Pertinent to this case, R.C. 2919.25(F)(1) states, in pertinent part:

(1) "Family or household member" means any of the following:

---

[3] The journal entry for the Parma Heights case indicates that Kelley was originally charged with first-degree misdemeanor domestic violence in violation of R.C. 2919.25(A) but the charge was amended to first-degree misdemeanor assault in violation of Parma Codified Ordinances 636.02 and he was convicted of the latter.

[4] We note that when the defense counsel moved for a dismissal pursuant to Crim.R. 29 after the state's case-in-chief, counsel did not argue the evidence was insufficient for the elevation of the domestic violence offense.

(a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender[.]

**{¶ 47}** Furthermore, pursuant to R.C. 2919.25(F)(2),

"[p]erson living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender *within five years prior to the date of the alleged commission of the act in question*.

(Emphasis added.)

**{¶ 48}** "Cohabitation" under R.C. 2919.25(F)(2) is not defined by statute. Pursuant to the case law, it includes situations where the victim and the offender "lived together and were in a relationship from which the domestic violence arose." *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 17. *See also State v. Danner*, 1st Dist. Hamilton No. C-220190, 2023-Ohio-638, ¶ 14.

**{¶ 49}** Here, the journal entries reflect that Kelley's prior convictions occurred in 2018. T.M. testified that she and Kelley were in a romantic relationship since January 2017. Kelley's probation officer Burnett testified T.M. was the victim in the Lorain County assault case and the court had issued a no-contact order. Furthermore, T.M.'s testimony established that she was the victim in both prior cases. The transcript reflects the following exchanges:

Q. Have you tried to leave under similar circumstances in the past?

A. In Parma and Lorain. Yes, I have.

Q. What happened during those prior times that you attempted to leave?

A. The same things that happened in this event.

Q. Which is what?

A. The first time in Parma, we were arguing and I honestly stayed outside —

* * *

A. He got my head in the kitchen and just kind of threw me around the apartment.

* * *

Q. [And] Lorain [?]

A. He just lost it and had a knife and I was up against the wall and * * * he just kind of had me up against the wall * * *.

{¶ 50} Moreover, T.M.'s testimony reflects that they had resided together during their relationship. When asked if she used emails to communicate with Kelley, she answered "not so much in the beginning, because we lived together in the beginning, so we didn't really have to e-mail each other." When asked how she knew it was Kelley trying to get inside her apartment in the November 17, 2020 incident, she answered, "I know his voice. I know his walk. I lived with him." When questioned about certain pictures of her she sent to Kelley, she testified that "I still have some of his [items] that I came across [when] I recently moved. * * * [W]e did live together and I sent him more than pictures. His union sweatshirt. Some stuff from his mom that he left at the house."

{¶ 51} Based on our review of the trial transcript, we find the state presented sufficient evidence — through T.M.'s testimony — to show that T.M. was cohabiting with Kelley at the time of the prior offenses or cohabiting with Kelley "within five years prior to" those offenses. R.C. 2919.25(F)(2). *See Danner*, 1st Dist. Hamilton No. C-220190, 2023-Ohio-638 (sufficient evidence existed for domestic violence where the victim and defendant had been living together for at least one year and, therefore, cohabiting within five years prior to the incident pursuant to R.C. 2919.25 (F)(1) and (2)). *See also State ex rel. McDonald v. Indus. Comm.* of Ohio, 2021-Ohio-4494, 182 N.E.3d 482, ¶ 26 (10th Dist.), citing *State v. West*, 10th Dist. Franklin No. 06AP-114, 2006-Ohio-5095, ¶ 14, citing *State v. Avery*, 5th Dist. Stark No. 2004-CA-00010, 2004-Ohio-5226, ¶ 41 (a person in a romantic relationship who was living in the same house as the defendant constituted a "family member" for purposes of R.C. 2919.25(F)).

{¶ 52} In support of his claim of insufficient evidence, Kelley cites *State v. Mallory*, 2022-Ohio-3667, 199 N.E.3d 104 (8th Dist.). In that case, appellant argued that the state failed to present sufficient evidence to warrant the enhancement of the domestic violence conviction to a felony of the fourth degree because the journal entry of conviction did not specify that the victim involved in his prior assault conviction was a family or household member. This court agreed and reversed appellant's conviction of fourth-degree felony domestic violence, rejecting the state's claim that the offense of assault is "substantially similar" to domestic violence. *Mallory* is distinguishable, however. In contrast to *Mallory*, the state in

the instant case produced evidence — through T.M.'s testimony — to prove that she was the victim in the two prior cases and she was in a relationship with Kelley since 2017 and had resided with him during at least some periods of their relationship.

{¶ 53} Viewing the evidence presented at the trial in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential element of prior convictions involving a family or household member as defined in R.C. 2919.25(F)(1) and (2) proven beyond a reasonable doubt. We therefore conclude sufficient evidence exists to support Kelley's conviction of third-degree felony domestic violence. The second assignment of error is not well taken.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN A. GALLAGHER, J., CONCUR